IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMANDA J. ENSOR,

*Plaintiff*,

v.                                    Civil Action No. ELH-20-1266

CHARLES A. JENKINS, *et al*.

*Defendants*.

**MEMORANDUM OPINION**

In this employment discrimination action, plaintiff Amanda Ensor, a Sergeant ("Sgt.")

employed in the Frederick County Sheriff's Office ("FCSO" or "Sheriff's Office"), filed suit

against defendants Frederick County (the "County"); the FCSO; Frederick County Sheriff Charles

Jenkins; Captain ("Capt.") Ronald Hibbard of the FCSO; Lieutenant ("Lt.") Jason Null of the

FCSO[1]; and Lt. Gregory Warner of the FCSO.  ECF 1.  Plaintiff later filed an Amended Complaint.

ECF 3.[2]   Jenkins, Hibbard, Null, and Warner were sued in their official and individual capacities.

---

[1] Null is now a Captain in the FSCO.  But, during the relevant period, he held the rank of
Lieutenant.  S*ee* ECF 3, ¶ 5.  Consistent with the Amended Complaint, I refer to him as Lt. Null.

[2] Plaintiff appended three exhibits to the original Complaint (ECF 1-1; ECF 1-2; ECF 1-
3), which she did not append to the Amended Complaint.  "Ordinarily, an amended complaint
supersedes those that came before it."  *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021)
(citing *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)).  However, the Amended
Complaint explicitly references the three exhibits.  *See* ECF 3, ¶¶ 25, 27, 85.  And, defendants cite
them in their briefs.  *See, e.g.*, ECF 5-1 at 16; ECF 13-1 at 4.  Therefore, under the circumstances,
I may consider the three exhibits included with the original complaint, as discussed, *infra*.  *See
Diggs*, 986 F.3d at 499 (concluding that a verified complaint has evidentiary value notwithstanding
that it was superseded by an amended complaint)

*Id.*  I shall refer to the individual defendants and the FCSO collectively as the "FCSO Defendants."[3]

The suit concerns an investigation and disciplinary proceeding conducted by the Sheriff's Office, which was prompted by Sgt. Ensor's participation in a video published on YouTube.[4] Plaintiff characterizes the video as a "prank video" intended to "foster community goodwill," on which she collaborated with "famous YouTubers who live in Frederick County."  *Id.* ¶ 19.  She alleges that she was unlawfully investigated, penalized, and effectively demoted as a result of her participation in the video.  *Id.* ¶ 24.  And, according to Sgt. Ensor, since her alleged demotion, she has been "harassed, discriminated against and retaliated against in a multitude of ways."  *Id.* ¶ 28.

The Amended Complaint contains five counts and seeks damages as well as equitable relief.  *See id.* ¶¶ 45, 53, 67, 77, 89.  Sgt. Ensor alleges disparate treatment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count I), and in violation of the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2014 Repl. Vol., 2017 Supp.), § 20-601 *et seq.* of the State Government Article ("S.G.") (Count II).  ECF 3 at 17, 19.  The remaining three counts invoke the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").  In Count III, plaintiff alleges "Unlawful Interference and Denial of FMLA Benefits Due to Transfer/Demotion in Violation of 29 U.S.C. § 2615(a)(1)." ECF 3 at 21.  In both Count IV and Count V, plaintiff asserts "Discrimination/Retaliation for taking FMLA Leave in Violation of 29 U.S.C. §2615(a)(2)."  *Id.* at 23, 25.  Count IV concerns leave

---

[3] As discussed, *infra*, plaintiff has since agreed to the dismissal of the Sheriff's Office as a defendant.  *See* ECF 19 at 2.

[4] "A subsidiary of Google, YouTube is the world's most widely used online video hosting platform. . . .  Content creators may upload videos to the YouTube platform without charge, enabling YouTube's billions of users to view them, comment on them, and subscribe to their favorite creators' channels."  *Divino Grp. LLC v. Google LLC*, No. 19-CV-04749-VKD, 2021 WL 51715, at *1 (N.D. Cal. Jan. 6, 2021).

taken by plaintiff in October 2018. *Id.* ¶ 74. Count V concerns leave taken by plaintiff in March 2020. *Id.* ¶ 84, 85. Sgt. Ensor seeks damages as well equitable relief. *See id.* ¶¶ 45, 53, 67, 77, 89.

Multiple motions are now pending. The County has filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, a motion for summary judgment (ECF 5), supported by a memorandum of law. ECF 5-1 (collectively, the "County Motion"). It has also submitted several exhibits. The FCSO Defendants have filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF 13), supported by a memorandum of law. ECF 13-1 (collectively, the "FCSO Motion"). They have also submitted several exhibits. Although the FCSO Motion invokes Rule 12(b)(1), the FCSO Defendants do not contend that the Court lacks subject matter jurisdiction over the suit. Rather, they assert Eleventh Amendment immunity as to certain claims against defendants in their official capacities. *Id.* at 10, 13, 23.

Plaintiff's opposition to the County Motion is docketed at ECF 18 and accompanied by exhibits. Her opposition to the FCSO Motion is docketed at ECF 19. The County's reply is at ECF 20, and the FCSO Defendants' reply is at ECF 21.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall construe the County Motion (ECF 5) as one to dismiss and I shall deny it. I shall grant in part and deny in part the FCSO Motion (ECF 13).

## I. Background[5]

### A.

Sgt. Ensor began working for the Sheriff's Office as a Deputy Sheriff in October 2002. ECF 3, ¶ 15. She was a "a hard-working employee" who regularly received "accolades and 'attaboys' . . . for a job well done." *Id.* For over eighteen years, plaintiff often received "excellent" performance evaluations and never received a "bad" one. *Id.*

Plaintiff alleges that since she joined the FCSO, "she has been treated differently because she is a woman." *Id.* ¶ 32. For instance, in 2004 plaintiff's superior told her that "he had a 'hit list' for women at work he wanted to have sex with," and asked her "if she wanted to have sex with him." *Id.* The question made plaintiff feel "extremely uncomfortable." *Id.* "A similar incident occurred with another supervisor a few years later." *Id.*

In addition, Sgt. Ensor alleges that she experienced "discrimination based on gender when she became pregnant . . . in 2011." *Id.* ¶ 33. When plaintiff was six-months pregnant she was placed on "light duty." *Id.* Her superior at the time attempted to bar plaintiff from working overtime hours, which plaintiff resisted, insisting "that she could not be denied overtime just because she was pregnant." *Id.* Shortly thereafter, plaintiff was transferred out of the Narcotics section. *Id.* After returning from maternity leave, plaintiff "returned to Narcotics" but was again "forced out." *Id.* ¶ 34.

Sgt. Ensor characterizes the culture of the Sheriff's Office as "one of discriminatory animus toward multiple protected characteristics, including sex." *Id.* ¶ 14. Sheriff Jenkins, who leads the

---

[5] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). The Court may consider documents attached to the Complaint or the Motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

FCSO, contributes to that culture, according to plaintiff. *See id.* Sgt. Ensor alleges: "Defendant Jenkins has publicly expressed that females should not be in supervisory or command positions. He talks about women in a derogatory manner. . . ." *Id.* Moreover, the Sheriff "disapproved of women taking leave time." *Id.* ¶ 17.

In February 2017, Sgt. Ensor "had serious medical surgery," for which her doctors directed her to take six to eight weeks off from work "to recuperate." *Id.* However, because plaintiff "feared retaliation" from the Sheriff, "she shortened her leave time to two weeks." *Id.* But, the Amended Complaint states that this incident is not "the subject of this action." *Id.*

According to the Amended Complaint, plaintiff has lived in Hagerstown, which is not located in Frederick County, since 2005. *See id.* ¶¶ 3, 35. FCSO policy prohibits FCSO vehicles "from being taken out of county." *Id.* ¶ 35. Although plaintiff was "grandfathered in under the current policy," for a period in 2011, plaintiff's superiors prohibited her from driving her vehicle to her home. *Id.* In plaintiff's view, this reflected "animus" toward her. *Id.*

**B.**

In 2016, Sgt. Ensor served as the FCSO's Police Information Officer ("PIO"). ECF 3, ¶ 20. The role entailed engaging in "community building activities" and managing the "online presence" of the Sheriff's Office. *Id.* She alleges, in part, *id.* ¶¶ 22-23:

> 22. . . . As PIO, Sgt. Ensor developed the only presence for the FCSO. She created different social media platforms for the agency and was commended by supervisors, deputies and the public on numerous occasions for her work. . . . At no time during her assignment as the PIO was Sgt. Ensor required to run anything by the Sheriff. He freely allowed Sgt. Ensor to post any video or information that she chose, without speaking to him first. His position was that he trusted her judgement and never monitored what she posted. The only time he expressed concern about posting was to ensure that she posted things for him pertaining to his political appearances.

> 23. As PIO, Sgt. Ensor looked for ways to promote a positive image of FCSO. She sought to highlight the good works of the FCSO and to interact with the

community in a way that engendered respect. Sometimes that was as simple as showing the community that FCSO can have fun and be cool. One of the vehicles she used to accomplish this was posting photos and short videos. . . .

The Amended Complaint does not specify when plaintiff's tenure as PIO began or ended. But, she clearly held the position in 2016. *See* ECF 3, ¶ 20. In the FCSO Motion, defendants assert that plaintiff did not serve as PIO in September 2018. *See* ECF 13-1 at 4 n.2. Plaintiff does not dispute the assertion.

Until January 2019, plaintiff was "the only female sergeant of Patrol Team Operations" employed by the FCSO. *Id.* ¶ 16. "As the Sergeant of Patrol Team 1, she was in charge of all discretionary calls. She oversaw between 15 and 30 deputies and provided supervisory responses on calls involving overdoses, deaths, serious crashes, and any crime involving communication with the States [sic] Attorney's Office . . . ." *Id.*

In September 2018, Ms. Ensor "participated in" a "prank video" with two other officers and the so-called Dobre Brothers. *Id.* ¶ 19.[6] Exhibits submitted by defendants reflect that plaintiff's participation in the video occurred on September 29, 2018. *See, e.g.*, ECF 13-5 at 4. The Dobre Brothers are "famous YouTubers who live in Frederick County." *Id.* Earlier in 2018, the Dobre Brothers "were contacted" by the FCSO and invited to participate in a "viral lip synch challenge that was going on for many law enforcement agencies," although ultimately the "challenge did not come to fruition." ECF 3, ¶ 23.

As to the events of September 29, 2018, plaintiff alleges, *id.*:

[The Dobre Brothers] asked if the Sheriff's office would 'prank' their brother, Marcus, by arresting him at their residence. Marcus was in on the prank. Sgt. Ensor did not record the video or post it on any social media sites. She participated in the

---

[6] The Amended Complaint alternates between the spelling "Dobre brothers" and "Dobre Brothers." *Compare* ECF 3, ¶ 19 *with id.* ¶¶ 21, 22.

staged prank to promote a positive relationship with the Dobre brothers in the community and to show that the police can interact with the public and have fun.

In light of Sgt. Ensor's prior experience as PIO, she was "comfortable with the [Dobre Brothers'] request." *Id.* ¶ 20. And, she ensured that, at the end of the video, the Dobre Brothers disclosed that the apparent arrest was staged and acknowledged the participation of "the Sheriff's office." *Id.* ¶ 21. The Amended Complaint does not describe the contents of the video.

Plaintiff did not "take any gratuities or receive any compensation" for her participation in the video. ECF 3, ¶ 21. While the video was being recorded, plaintiff "continued to monitor radio transmissions . . . in the event she was needed at another call for service or requested by a deputy." *Id.* Moreover, she claims she never sought "to hide the fact that she was interacting with the Dobre Brothers." *Id.* And, according to the Amended Complaint, "Defendants have allowed the video to remain on YouTube." *Id.* ¶ 20.[7]

On October 1, 2018, plaintiff underwent "major surgery" to her shoulder and arm because of a "torn labrum." *Id.* ¶ 18. She began a period of "FMLA leave" through December 15, 2018. *Id.*[8] During that period, the FCSO began an "internal investigation" into plaintiff's involvement in the video. *Id.* ¶ 18; *see id.* ¶ 19. The Amended Complaint refers to the internal investigation as an "IA." *See* ¶¶ 18, 24(a).

---

[7] As the County points out, the video remains publicly available on YouTube. ECF 5-1 at 9 n.1; *see* ECF 3, ¶ 20. As of February 26, 2021, the video had received more than 9 million views. *See* Lucas and Marcus, *POLICE PRANK ON TWIN BROTHER!*, YOUTUBE (Sep. 30, 2018), https://youtu.be/7zIR375d0ww. The Court may take judicial notice of the video's publication on YouTube. *See* Fed. R. Civ. P. 201.

[8] Later, the Amended Complaint specifies that plaintiff returned to work on December 17, 2018. ECF 3, ¶ 27. That date fell on a Monday. *See* Fed. R. Evid. 201 (permitting a court to take judicial notice of "adjudicative facts.")

The investigation was conducted by the Office of Policy and Compliance ("Office") within the FCSO, which is led by Lt. Warner.  *See id.* ¶¶ 6, 26; ECF 13-3 ("Internal Investigation File"). The Internal Investigation File shows that the video was reported to the Office by Lt. Jeff Eyler, who is assigned to "Patrol Ops" in the Sheriff's Office.  ECF 13-3 at 3.  The two other FCSO officers who were also involved in the making of the video, Deputy Brandon Jewell and Deputy Amber Blackmire, were also subjects of the investigation.  *Id.*  However, it appears that the investigation did not result in findings of misconduct as to Jewell or Blackmire.  *Id.* at 6-7.

On November 15, 2018, while plaintiff was on FMLA leave, "Lt. Warner came to Sgt. Ensor's home, during a snowstorm, to serve her with the IA complaint."  ECF 3, ¶ 25; *see id.* ¶ 18; *see also* ECF 13-2 (containing a "Notification of Complaint" dated November 15, 2018, which appears to have been signed and received by Sgt. Ensor that day).  And, plaintiff "was ordered by Lt. Warner to come to the Sheriff's Office, while she was still recuperating, to submit to an interrogation. . . . Lt. Warner and Sheriff Jenkins insisted that she report for the interrogation." ECF 3, ¶ 18.

On the same date, Sgt. Ensor's counsel at the time, Patrick McAndrew, sent Lt. Warner a letter regarding plaintiff's rights as a subject of an internal investigation.  *See* ECF 1-1.  The letter, which was sent both by email and U.S. mail, stated that serving plaintiff "with documents relating to a pending internal investigation" while plaintiff was "out on FMLA leave" violates the Law Enforcement Officer Bill of Rights ("LEOBR") and the FMLA.  *Id.* at 1; *see* ECF 3, ¶ 25.  The letter also asserted that conducting an "interrogation" as part of the investigation during plaintiff's leave was impermissible under the LEOBR and FCSO "General Order 52.3, Internal Affairs Procedures."  *See* ECF 1-1 at 1.  And, McAndrew stated that Sgt. Ensor "is presently not prepared to defend herself in an internal investigation while recovering from a major surgery."  *Id.* at 2.

But, McAndrew indicated that plaintiff would agree to participate in an interrogation upon her return to work. *See id.* at 1-2.

Sgt. Ensor alleges, *id.* ¶ 25: "The FCSO has one year to serve an officer with an IA complaint. They knew Sgt. Ensor was out on FMLA leave for surgery. They knew it was highly unusual to begin an investigation when an officer is out on protected leave." Nevertheless, Sgt. Ensor participated in an interrogation while on FMLA leave. *See id.* ¶¶ 6, 19, 24, 41. The Amended Complaint does not specify the date of the interrogation. But, an exhibit submitted by the FCSO Defendants indicates that it occurred on December 7, 2018. ECF 13-4. At that time, Sgt. Ensor was still on FMLA leave, *see* ECF 3, ¶¶ 18, 27, although she had previously anticipated returning to work by then. *See* ECF 1-1.

Plaintiff returned from leave on December 17, 2018. ECF 3, ¶ 27. She "was 'temporarily' transferred out of Patrol Operations to Judicial Services at the [Frederick County] Courthouse." *Id.; see id.* ¶ 16. However, the transfer was not actually temporary; Sgt. Ensor has been assigned to Judicial Services at the Frederick County Courthouse ever since she returned from FMLA leave on December 17, 2018. *Id.* ¶ 27.

Ensor asserts that Lt. Warner's investigation was supposed to be "independent." ECF 3, ¶ 26. But, plaintiff alleges, *id.*

> The IA investigation against Sgt. Ensor was not independent because Command staff was allowed to alter the charges and findings reached by the Office of Compliance. The Office of Compliance investigated the allegations but then sent its findings back down to Captain Hibbard and permitted him to add charges and findings after the fact. Initially, Lt. Warner's sole finding of wrongdoing was that Sgt. Ensor did not obtain permission from the Sheriff, the result of which would be a written reprimand. When Sgt. Ensor received the Notification of Charges in January 2019, she was surprised to find two additional charges, including the serious, albeit nebulous, charge of "Incompetence." Instead of the investigation proceedings going through the proper chain of command, they went from Lt. Warner in the Office of Policy and Compliance back to Captain Hibbard in December 2018. Captain Hibbard added the serious allegations and offenses before

9

sending it through the chain of command. This is not normal procedure. In the end, it permitted exactly what it is structured to prevent, a personal attack by Defendants Hibbard and Jenkins on Sgt. Ensor.

The Amended Complaint does not include any additional details about the charges against Sgt. Ensor or the results of the investigation.  Plaintiff asserts: "The IA discipline was officially issued on January 23, 2019."  ECF 3, ¶ 27.

The FCSO Defendants have submitted a copy of the "Notification of Charges" issued to Sgt. Ensor on January 23, 2019, and signed by her on that date.  ECF 13-5 at 2, 3.  Plaintiff was charged with violations of three "Rules, Policy, and Procedures" of the Sheriff's Office: "Abuse of Position/Unauthorized Use of Likeness" (Rule 4.4); "Neglect of Duty (Inattentiveness to duty)" (Rule 26-2); and "Incompetence (Perform to the highest standard)" (Rule 34-2).  *Id.* at 1-2.

According to the Notification of Charges, Rule 4-4 provides, *id.* at 1:

An employee shall not permit or authorize the use of his/her name, photograph, or official title identifying him/her as an employee of the Frederick County Sheriff's Office in connection with testimonials or advertisements of any commodity or commercial enterprise, or for personal reasons without the written approval of the Sheriff.

Rule 26-2 states: "An employee will not read, play games, watch television or movies, or engage in any activity or personal business while on duty that would cause neglect or inattentiveness to that duty."  *Id.*  And, Rule 34-2 provides: "Employees shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Frederick County Sheriff's Office."  *Id.*

The Notification of Charges included a "Statement of Facts," which stated, *id.* at 4:

On September 29, 2018, Sgt. Amanda Ensor was on duty and coordinated and participated in an unapproved video "stunt" involving the Dobre Brothers that was filmed by a member of their crew, and the following day, the video was posted on the Dobre Brothers YouTube channel, which has garner[e]d over 1.5 million views. The video showed the two deputies pulling over one of the Dobre Brothers, handcuffing, and subsequently interviewing the Dobre Brothers about a dog that was abandoned.  Both of the Dobre Brothers ended up being handcuffed.  The plot

of the video was that one of the Dobre Brothers was pranking the other to make it appear that one was being arrested/investigated for abandoning a dog. The deputies involved were Deputy Blackmire and Deputy Jewell, both subordinates of Sgt Ensor. Sgt. Ensor was observed on video at the end of the video. The video was recorded at the Dobre's [sic] residence on Stewart Hill Rd. in Adamstown, MD. The video was made during the evening hours of 09/29/2018 while Sgt. Ensor, Deputy Jewell, and Deputy Blackmire were on duty, wearing their agency issued uniforms, being compensated by the County, and working their assigned shift. Sgt. Ensor orchestrated the video by contacting both Deputy Blackmire and Jewell asking them to be involved, which both of them did. It was learned through the Internal Investigation that the deputies were at the Dobre Brothers residence for about 50-55 minutes.

Sgt. Ensor was on duty, wearing official Sheriff's Office uniform and equipment, being paid by the agency, and utilizing a marked Sheriff's Office vehicle. The video that was created was not approved by the Sheriff or by any members of the Command Staff.

Plaintiff signed the Notification of Charges below the Statement of Facts. *Id.*

The charges were "sustained." ECF 13-5 at 2. The internal investigation recommended a written reprimand as to the Rule 4-4 violation and a "[l]oss of take home vehicle [for] 30 working days" for the Rule 26-2 violation. *Id.* As to the charge of incompetence under Rule 34-2, the internal investigation recommended a fifteen-day (120-hour) suspension without pay and plaintiff's transfer from "Patrol Operations" to "Judicial Services." *Id.* The document also advised plaintiff of her right to a hearing under LEOBR. *Id.* at 3.

According to an exhibit submitted by the FCSO Defendants, Sgt. Ensor admitted to the charges on January 28, 2019. ECF 13-6 ("Waiver Of Law Enforcement Officer's Bill Of Rights And Acceptance of Disciplinary Action" or "Waiver"). Accordingly, plaintiff waived her rights under the LEOBR, including her right "to appeal the finding and disciplinary action." *Id.*

Sheriff Jenkins sought to make plaintiff's transfer to the Courthouse "permanent." *Id.* On March 21, 2019, plaintiff learned from Lt. Null, her commanding officer, *id.* ¶ 5, that in order to make plaintiff's transfer permanent the FCSO had to "reclassify her position" and "to show that they needed another Sergeant's position at the Courthouse." *Id.* ¶ 27. To that end, *id.,*

> . . . the Sheriff requested the County Executive's approval for a concocted emergency reclassification of the sworn Court Security Corporal's position to a sworn Court Security Sergeant's position.  He represented in his March 5, 2019 letter to County Executive, Jan Gardner, a copy of which is attached as Exhibit 2 that "changes in the law have necessitated an increased number of sworn personnel in Court Security."

According to plaintiff, the Sheriff's representation was "false," and "made solely to demote Sgt. Ensor." *Id.*

Relatedly, plaintiff was told by Lt. Null that "if HR were to come over and ask her, she would have to say that she was in charge of the unit [at the courthouse]." *Id.*  But, Null added that plaintiff "was in charge only of sworn personnel" and another sergeant is "truly in charge" of the "Court Security Unit." *Id.*

A copy of Sheriff Jenkins's letter to the County Executive, dated March 5, 2019, is appended to the original Complaint at ECF 1-2 (the "Jenkins Letter").  The Jenkins Letter indicates that the "additional annual cost" of the requested reclassification was approximately $4,200. *Id.* at 2.  But, it noted that the "cost can be absorbed by the Sheriff's office salaries budget . . . ." *Id.*

Further, plaintiff alleges, *id.* ¶ 28:

> Since being transferred to the Courthouse, under the command of then Lt. Null, Sgt. Ensor was harassed, discriminated against and retaliated against in a multitude of ways. Lt. Null held her to standards to which the male employees, who are her subordinates, are not held, including, but not limited to prohibiting her from leaving the Courthouse for even a lunch break. Lt. Null has since been promoted to Captain.

Moreover, plaintiff would rather continue working in "Patrol," which Sheriff Jenkins knew was her "true love." *Id.* ¶ 29.

The Amended Complaint identifies three male officers employed by the FCSO who were disciplined less severely, if at all, for "more egregious actions." *Id.* ¶ 30; *see id.* ¶ 36.  As to the first comparator, referred to as "Officer Doe," plaintiff alleges, *id.* ¶ 30:

> . . . Officer Doe, violated a person's constitutional rights during a search and seizure by opening a safe in a residence without having a signed search warrant.  He was

the supervisor on the scene. . . .  He committed a major violation, the type that causes commanders and peers to lose credibility in him and the public to lose credibility in the FCSO.  Most officers would be fired for this violation.  Officer Doe received a lesser punishment than Sgt. Ensor: 2 weeks suspension without pay.

The second comparator, referred to as "Officer Smith," "broke into an occupied condo" in Ocean City while intoxicated and stole alcohol.  *Id.* ¶ 31.  The incident occurred sometime in 2016. *Id.*  Ocean City law enforcement was dispatched to the scene, but Officer Smith was "retrieved by" Capt. Hibbard, who "happened to be in Ocean City" at the time.  *Id.*  Officer Smith was neither charged criminally nor disciplined by the FCSO.  *Id.*  Rather, Sheriff Jenkins "hid" Officer Smith's actions and "verbally brushed [them] off."  *Id.*

The third comparator participated in a "'prank.'"  *See id.* ¶ 36.  Plaintiff alleges, *id.* :

[O]n June 20, 2018, Lt. Jeffrey Eyler and Deputy Doug Story responded to a call for an alarm at the Frederick Christian Fellowship Church in Frederick during an evening church session.  An attractive, young female met them outside the church and asked them to place her in handcuffs and pretend to arrest her by walking her inside, in handcuffs, in front of the entire congregation to "prank" them.  Dep. Story declined but Lt. Eyler agreed and placed the female in handcuffs.  He proceeded to walk her into the church, past a group of members, to the front of the church. Sgt. Ensor sought an internal investigation against Lt. Eyler for violating the same rules for which she was so harshly punished. She submitted the paperwork to her then supervisor, Lt. Null on February 26, 2019. By March 7, 2019, she received a letter from Sheriff Jenkins stating that the appropriate action was taken. Upon information and belief, Lt. Eyler was not reprimanded or punished in any way. . . . It appears no investigation was conducted.

Sgt. Ensor underwent "hernia surgery" on March 20, 2020.  *Id.* ¶ 85.  Before the surgery, plaintiff requested and received approval for "FMLA leave for the surgery and her recovery."  *Id.* Her doctor also approved "restricted duty" during her recovery.  *Id.*  On March 15, 2020, plaintiff's supervisor, Lt. Benner, submitted to Null a written request that plaintiff be placed on "restricted duty" during her recovery.  *Id.*  A copy of the letter is docketed at ECF 1-3.  In the letter, Lt. Benner stated that he had "several projects Sgt. Ensor can work on while on light duty . . . ."  *Id.*

13

Lt. Null denied plaintiff's request for restricted duty.  ECF 3, ¶ 85.[9]  As a result, plaintiff "was forced to use her sick leave to cover time off when she was capable of working a restricted duty assignment."  *Id.*  However, around the same time, a male officer, Sgt. Trevor Hajjar, was "allowed to work a restricted duty assignment" after undergoing surgery.  *Id.*

## C.

On March 19, 2019, Sgt. Ensor filed a formal Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC").  Both the County and the FCSO Defendants have submitted a copy of the Charge.  ECF 5-9; ECF 13-7.[10]

The Charge identified the Sheriff's Office as plaintiff's employer.  ECF 13-7 at 2.  Plaintiff checked the box for discrimination based on sex.  *Id.*  She indicated that discrimination occurred on November 15, 2018; she did not specify a longer time span.  *Id.*  The narrative portion of the Charge provides, in full, *id.* :

> I.  I began my employment with the above-named Respondent on October 2002, as a Sergeant.  On November 15, 2018, I was disciplined and suspended by Charles A. Jenkins (Sheriff).  However, Lieutenant Jeffrey Eyler (male) who committed a similar violation was not disciplined or suspended.
>
> II.  Respondent stated that I was disciplined and suspended for violating departments policies.
>
> III.  I believe that I was discriminated against based on my sex (Female) with respect to discipline and suspension in violation of Title VII of the Civil Rights Act of 1964, as amended.

---

[9] Lt. Benner's letter reflects that by  March 15, 2020, Null had been promoted to Captain. *See* ECF 1-3.

[10] Although plaintiff does not mention the Charge specifically in her Amended Complaint, she references the "Notice of Right to Sue" issued by the EEOC.  ECF 3, ¶ 12.

The EEOC mailed a "Dismissal and Notice of Rights" letter to plaintiff on February 2, 2020.  ECF 13-8 ("Right to Sue Letter"); ECF 3, ¶ 12.  Plaintiff's counsel received the Right to Sue Letter on February 22, 2020.  EF 3, ¶ 12.  Suit followed on May 20, 2020. ECF 1.

Sgt. Ensor asserts that she has "satisfied the notice provisions of the Local Government Tort Claims Act and the Maryland Tort Claims Act."  ECF 3, ¶ 13.  Further, she asserts that the "machinations" of the FCSO have made her "miserable."  *Id.* ¶ 29.  "She suffers from sleep deprivation, stress and anxiety, often waking up in a cold sweat, fearing what treatment next awaits her."  *Id.*  She has been prescribed medication for anxiety.  *Id.*

Additional facts are included, *infra*.

## II.  Legal Standards

### A.

As noted, the County's Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment."  ECF 5.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

In general, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be

on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[11]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th

---

[11] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

Cir. 2014); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam); *see also Goodman v. Diggs*, 986 F.3d 493, 500-01 (4th Cir. 2021) .

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub. nom. Gardner v. Ally Fin., Inc*., 514 F. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Sgt. Ensor has submitted an affidavit with her opposition to the County's Motion. ECF 18-1. But, the affidavit does not address the need for discovery. *See id.* However, in her opposition she states: **"**To the extent this Court deems it necessary to include these further details in her Complaint, Sgt. Ensor will amend her Complaint to so allege. . . . Because the County raises as an issue a fact that Sgt. Ensor had not thought to question because to her, her employment by the County is obvious, Sgt. Ensor should be afforded an opportunity to engage in discovery to learn the complete and accurate extent of the County's role as it pertains to the County's legal arguments." ECF 18 at 4.

The case of *McCray*, 741 F.3d 480, is informative here. In *McCray*, the Fourth Circuit considered whether the district court erred when it granted summary judgment to the defense before plaintiff had an opportunity to conduct discovery. *Id.* at 483. The plaintiff in *McCray* had been an employee of the MTA for more than 40 years before she filed an EEOC Charge alleging, *inter alia*, discrimination under Title VII, based on race and gender. *Id.* at 481-82. In the district court, the MTA moved to dismiss the suit.  The plaintiff sought to conduct discovery, pursuant to Rule 56(d). *Id.* at 482. The district court denied plaintiff's motion because the parties had already engaged in discovery during the administrative investigation and had submitted substantial documentary evidence in support of their positions.  *Id.*  Therefore, the court converted the MTA's motion to one for summary judgment.

On appeal, the Fourth Circuit reiterated that discovery is appropriate when "the main issue" is "one of motive" and when "most of the key evidence lies in the control" of the party moving for summary judgment. *Id.* at 484.  According to the Fourth Circuit, plaintiff's Title VII claims required her to show "that she was fired because of discriminatory reasons," and such evidence was within the control of the MTA.  *Id.*  "Absent discovery," said the Court, the plaintiff lacked "adequate access to this evidence, and therefore no way to shield herself from a premature summary judgment motion." *Id.* The Fourth Circuit concluded that summary judgment was premature under Rule 56(d).  *Id.* at 481, 484.

As in *McCray*, Sgt. Ensor's claims require her to show that she was disciplined and transferred because of discriminatory reasons.  Evidence that could support her claims is within the control of the FCSO.  Accordingly, I will consider the County's Motion as one brought under Fed. R. Civ. P. 12(b)(6), without converting it to a summary judgment motion under Rule 56.  *See Adams Housing, LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam)

(A party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'") (quoting *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989)).

## B.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal

pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether

those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire*

*Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, the original Complaint was supported by three exhibits (ECF 1-1, ECF 1-2, ECF 1-3), which are explicitly referenced in the Amended Complaint. ECF 3, ¶¶ 25, 27, 85. And, defendants do not suggest that the exhibits may no longer be considered. In any event, the contents of the exhibits are, to a degree, duplicative of the allegations in the Amended Complaint. *See id.* ¶¶ 25, 27, 85.

The FCSO Motion is supported by seven exhibits. ECF 13-2 is the Notification of Complaint as to the internal investigation into Sgt. Ensor, dated November 15, 2018. ECF 13-3 contains various materials pertaining to the case file for the internal investigation into Sgt. Ensor's

misconduct.  It includes a "Complaint Reception Form," *id.*  at 3; "Applicable General Orders and Findings" as to Deputy Jewell, Deputy Blackmire, and Sgt. Ensor, *id.*  at 6-8; and a narrative description of the investigation and its findings.  *Id.* at 9-18.  ECF 13-4 contains an undated "Preamble To Internal Affairs Statement/Interrogation" ("Preamble"), produced by McAndrew on behalf of plaintiff.  ECF 13-5 contains the Notification of Charges delivered to and signed by plaintiff.  ECF 13-6 is the Waiver signed by plaintiff on January 28, 2019.  ECF 13-7 contains the Charge filed by plaintiff with the EEOC.  And, ECF 13-8 contains the Right to Sue Letter.

The materials pertaining to plaintiff's pursuit of administrative remedies (ECF 13-7, EF 13-8) are integral to the Amended Complaint.  So too are the materials pertaining to the internal investigation into plaintiff and her guilty plea to the charges of misconduct.  Even though those materials were submitted by defendant, they directly pertain to plaintiff's allegations that she was investigated and disciplined because of her participation in the production of the video in September 2018.

However, in my view the narrative description of the investigation's findings, which is included in ECF 13-3, is not integral to the Amended Complaint.  That narrative "may reflect the defendant's version of contested events . . . that are unlikely to have been adopted by the plaintiff." *Goines*, 822 F.3d at 168.  Moreover, it is not clear whether plaintiff ever viewed those materials or was informed of the complete findings of the investigation prior to the submission of the FCSO Motion during the course of litigation.  In contrast, plaintiff received and signed the Notification of Charges (ECF 13-5), which included a "Statement of Facts."  That set of facts is two paragraphs in length.  In contrast, the findings set forth in the case file contained in ECF 13-3 span several pages.  *Compare* ECF 13-5 *with* ECF 13-3 at 9-18.  Therefore, I shall not consider the narrative component of ECF 13-3 at 9-18.

25

The Preamble is not referenced in the Amended Complaint, is not integral to the Amended Complaint, and is not a publicly available document.  Therefore, in resolving the Motion, I shall not consider ECF 13-4.

The County's Motion is supported by eight exhibits.  ECF 5-2 contains an excerpt of the "Disciplinary Procedures" of the FCSO, which are "set out in FCSO General Order 26.1," according to the County.  ECF 5-1 at 10.  ECF 5-3 contains an excerpt of "FCSO General Order 52.3," which sets forth the procedures governing internal investigations.  ECF 5-1 at 11.  ECF 5-4 contains the Notification of Charges.  ECF 5-5 contains the "Affidavit Of Lieutenant Colonel Scot Hopkins," which attests to the authenticity of ECF 5-4, ECF 5-6, ECF 5-7, and ECF 5-8.  ECF 5-6 contains the "Right to Hearing" document, which was delivered to plaintiff together with the Notification of Charges.  ECF 5-7 contains plaintiff's Waiver.  ECF 5-8 contains the FCSO's "Rules of Conduct."  And, ECF 5-9 contains plaintiff's Charge of Discrimination.

ECF 5-4, ECF 5-6, ECF 5-7, and ECF 5-9 contain materials that were also submitted by the FCSO Defendants.  Except for ECF 5-5, the remaining exhibits are integral to the Amended Complaint, as they pertain to the basis for the internal investigation.  Therefore, I may consider them.  However, the "Affidavit Of Lieutenant Colonel Scot Hopkins" (ECF 5-5) is not integral to the Amended Complaint.  Therefore, I shall not consider it.

Plaintiff has submitted five exhibits with her opposition to the County's Motion.  ECF 18-1 contains her Affidavit.  ECF 18-2 contains secondary source material: Local Government Insurance Trust, The Legal Relationship Between Counties and Sheriffs Past, Present and Future.  ECF 18-3 contains an excerpt of the 2020 Final Report & Recommendations of the Frederick County Charter Review Commission.  ECF 18-4 contains an excerpt of the exhibit docketed at ECF 1-2.  And, ECF 18-5 contains an excerpt of the Frederick County Personnel Rules.

ECF 18-2, ECF 18-3, and ECF 18-5 are publicly available materials.  Therefore, I may consider them.  I have already stated that I may consider the material submitted at ECF 1-2 and ECF 18-4, which are integral to the Amended Complaint.  But, plaintiff's affidavit is not referenced in the Amended Complaint, is not integral to the Amended Complaint, and is not a publicly available document. Therefore, in resolving the County's Motion, I shall not consider ECF 18-1.

## C.

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192.  Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true."  *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270).  In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, ___ F.3d ___, 2021 WL 821467, at *2 (4th Cir. Mar. 4, 2021) (describing sovereign immunity as "a weighty principle, foundational to our constitutional system"). Notably, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

The FCSO Defendants do not specify whether, in challenging jurisdiction, they assert Eleventh Amendment sovereign immunity as a facial challenge or as a factual challenge. *See* ECF 13-1 at 10-11. But, they base their arguments on the Amended Complaint, and do not point to extrinsic evidence, other than the aforementioned exhibits. Therefore, I shall construe their arguments regarding Eleventh Amendment sovereign immunity as a facial challenge, pursuant to Rule 12(b)(1).

### III.  The FCSO Motion

At the outset, I address an issue that is no longer in dispute. The parties now agree that the Sheriff's Office is not a proper defendant to the suit. The FCSO Defendants assert: "The Frederick County Sheriff's Office is not a separate legal entity subject to suit." ECF 13-1 at 11 (citing *Jarvis v. Montgomery Cnty.*, No. 11-cv-00654-AW, 2011 WL 5547979, at *3 (D. Md. Nov. 14, 2011); *Boyers v. State*, 323 Md. 558, 572 n.9, 594 A.2d 121, 128 n.9 (1991); *Hines v. French*, 157 Md.

App. 536, 578, 852 A.2d 1047, 1069 (2004)).  Those cases make clear that, under Maryland law,

county police departments "'are agents of the State and should not be viewed as separate legal

entities.'"  *Jarvis*, 2011 WL 5547979, at *3 (quoting *Hines*, 157 Md. App. at 578, 852 A.2d at

1069); *see also Broadus v. Adventist Health Care Washington*, PX-19-3636, 2021 WL 242496, at

*3 (D. Md. Jan. 25, 2021) (citing *Hines*); *Hicks v. Anne Arundel Cty.*, JKB-20-0022, 2020 WL

7624773, at *7 (D. Md. Dec. 22, 2020) (same).  And, there is no indication that the State has

waived its Eleventh Amendment immunity.  *See Pense v. Md. Dep't of Public Safety and*

*Correctional Services*, 926 F.3d 97 (4th Cir. 2019).

In her opposition Sgt. Ensor concedes that the Sheriff's Office is not a suable entity.  ECF

19 at 2.  Therefore, I shall grant the FCSO Motion as to the FCSO and dismiss the claims against

it.  I turn to the FCSO Defendants' other arguments.

### A. Disparate Treatment (Count I and Count II)

Count I and Count II lodge disparate treatment claims against the FCSO Defendants.  Count

I asserts a Title VII claim for "Disparate Treatment based on Sex/Gender," and Count II lodges a

FEPA claim for "Disparate Treatment based on Sex/Gender."  ECF 3 at 17, 19.

### 1. Title VII Generally

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual

with respect to [her] compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2.  The phrase

"terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank,*

*FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).  Title VII also bars

retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for

participation in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3; *see e.g.*, *Evans v.*

*Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray*, 662 F. App'x at 224. Exhaustion under Title VII is not jurisdictional; it is instead a "claim-processing rule[] that must be timely raised to come into play." *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019).

In general, *at trial* a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

As indicated, the avenues of proof pertain to trial.  At this juncture, reference to these methodologies merely serves to inform a court's evaluation of a motion to dismiss or for summary judgment.  *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas Corp.* . . . ."); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (same).

If the plaintiff chooses to proceed *at trial* under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant

"under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253.

To state a prima facie claim of racial discrimination, the plaintiff must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action[12]; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560

---

[12] To state a prima facie claim of *retaliation* under Title VII, a plaintiff need only allege adverse action, rather than adverse *employment* action, as discussed, *infra*. *See Strothers*, 895 F.3d 317, 327.

(4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As indicated, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the motion to dismiss stage, however, a plaintiff need not establish a prima facie case of discrimination under *McDonell Douglas*. In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court observed that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511.

Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ."  *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 1162 (2016).

However, as the Second Circuit has noted, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent."  *Id.* at 309.  On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ."  *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]"  Thus, the question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief under Title VII . . . ."  *Ciociola v. Balt. City Bd. of Sch. Comm'rs*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

## 2.  FEPA Generally

The Maryland Fair Employment Practices Act is the State law analogue to the federal employment discrimination statutes.  Maryland courts "'traditionally seek guidance from federal cases in interpreting [it].'"  *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (brackets added) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (914 A.2d 735, 742 (Md. 2007)) (construing former Article 49B of the Maryland

Code); *see Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019) (recognizing that FEPA "'is the state analogue of Title VII'") (citation omitted). Accordingly, the Court will analyze plaintiff's FEPA claim (Count II) under the Title VII standard. *See id.* (reasoning similarly).

### 3. Individual Liability

The FCSO Defendants urge dismissal of Count I and Count II as to Capt. Hibbard, Lt. Null, and Lt. Warner, in both their official and individual capacities. ECF 13-1 at 13. And, they request dismissal of both counts as to Sheriff Jenkins, in his individual capacity. *Id.* In their view, Title VII and FEPA do not provide for supervisory or individual liability. ECF 13-1 at 12-13.

In plaintiff's opposition, she "acknowledges that the Fourth Circuit has decided there is no individual capacity liability under Title VII." ECF 19 at 3. Indeed, "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998); *see Abeles v. Metro Wash. Airport Auth.*, 676 F. App'x 170, 176-77 (4th Cir. 2017); *Spell v. Wright*, RBD-19-722, 2020 WL 247460, at *3 (D. Md. Jan. 16, 2020) (dismissing Title VII claims against employees). Rather, only an employer may be held liable for Title VII violations because individual liability under Title VII "would improperly expand the remedial scheme crafted by Congress." *Lissau*, 159 F.3d at 181. Moreover, because the FEPA analysis tracks that of Title VII, there is no individual liability under FEPA. *See Brown v. Baltimore Police Dep't*, RDB-11-00136, 2011 WL 6415366, at *14 (D. Md. Dec. 21, 2011) ("Because supervisors cannot be liable in their individual capacities under Title VII . . . supervisors cannot be liable under . . . FEPA.").

In addition, plaintiff does not contend that Capt. Hibbard, Lt. Null, and Lt. Warner were her employer within the meaning of Title VII. Rather, she alleges that she was an employee of the

35

Sheriff's Office. *See, e.g.*, ECF 3, ¶ 2; ECF 13-7 (naming the FCSO as her employer in her Charge of Discrimination). Given that the FCSO is not a suable entity, as noted, it is appropriate to treat Sheriff Jenkins in his official capacity as plaintiff's employer for purposes of the Title VII and FEPA analysis. *See O'Connor v. Cameron*, DKC 17-3394, 2019 WL 1112281, at *3 (D. Md. Mar. 11, 2019) (reasoning that the St. Mary's County Sheriff, in his official capacity, was the plaintiff's employer).

Therefore, I shall dismiss Count I and Count II as to Capt. Hibbard, Lt. Null, and Lt. Warner in their official and their individual capacities. And, I shall dismiss Count I and Count II as to Sheriff Jenkins in his individual capacity.

### 4. Sovereign Immunity

The FCSO Defendants assert that sovereign immunity bars plaintiff's FEPA claim (Count II) against Sheriff Jenkins in his official capacity. ECF 13-1 at 13. They do not contend that plaintiff's Title VII claim is likewise barred, presumably because they are aware that Congress has abrogated the states' sovereign immunity for purposes of Title VII. *Savage v. Maryland*, 896 F.3d 260, 275 (4th Cir. 2018) (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976)).

Plaintiff does not dispute that the Sheriff is immune from suit under FEPA "to the extent this Court finds the Sheriff has acted in this case as a State actor." ECF 19 at 3. However, plaintiff argues that, under the circumstances of this case, the Sheriff "act[ed] on behalf of the County," not the State. *Id.*

The Fourth Circuit has recognized that the defense of sovereign immunity is a jurisdictional bar, as noted. *Cunningham*, 888 F.3d at 649. Moreover, "the burden of proof falls" to the party seeking such immunity. *Big Picture Loans*, 929 F.3d at 176.

**a.**

The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."

The Supreme Court has explained: "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases); *see*, *e.g.*, *Virginia Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *Lapides v. Bd. of Regents of Univ. Sys. of Georgia,* 535 U.S. 613, 618 (2002); *Kimmel v. Fla. Bd. of Regents*, 528 U.S. 62, 72-73 (2000). Thus, "the ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 531 U.S. at 363. Put simply, states are generally immune from suit for damages in federal court, absent consent or a valid congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012); *Va. Office for Prot. & Advocacy*, 563 U.S. at 253-54; *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 903 (2020).

The doctrine of state sovereign immunity from private suit predates the enactment of the Eleventh Amendment. *See Williams v. Morgan State Univ.*, ___ Fed. App'x ___, 2021 WL 1041699, at *2 (4th Cir. Mar. 18, 2021) (citing *Alden v. Maine*, 527 U.S. 706, 724 (1999); *Hans v. Louisiana*, 134 U.S. 1, 3 (1890)). However, as the Supreme Court affirmed in *Garrett*, 531 U.S. at 363, among several other decisions, it has construed the Eleventh Amendment to embody the broader principles of state sovereign immunity.

The Fourth Circuit recently echoed this principle in *Pense v. Md. Dep't of Public Safety and Correctional Services*, 926 F.3d 97 (4th Cir. 2019), stating, *id.* at 100: "The Supreme Court 'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" (Quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)); *see Lapides*, 535 U.S. at 618 ("The Eleventh Amendment provides that the 'Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the . . . States' by citizens of another State, U.S. Const., Amdt. 11, *and (as interpreted) by its own citizens*.") (emphasis added; ellipses in *Lapides*); *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012).

The parties refer to Eleventh Amendment immunity and state sovereign immunity interchangeably. *See, e.g.*, ECF 13-1 at 23; ECF 19 at 15. In this Memorandum Opinion, at various points, I refer to state sovereign immunity as Eleventh Amendment immunity, consistent with the parties' usage.[13]

State sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ.*

---

[13] Recently, in *Williams*, 2021 WL 1041699, the Fourth Circuit characterized state sovereign immunity as "a broader doctrine" than Eleventh Amendment immunity, and described the text of the Eleventh Amendment as a "rather narrow and precise provision . . . ." *Id.* at *2. But, *Williams* is not in tension with the well settled precedent of the Supreme Court and the Fourth Circuit, cited above, which establishes that the Eleventh Amendment has been construed to embody the broader principles of state sovereign immunity.

*of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense*, 926 F.3d at 100; *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).   Put another way, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).   In contrast, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).

    The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suit against a state or an arm of a state.   In *Lee-Thomas*, 666 F.3d at 249, it said (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

    To be sure, a state may waive its sovereign immunity and permit suit in federal court. *See Lapides*, 535 U.S. at 618; *Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249.  But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds,*

*as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101; *cf. FAA v. Cooper*, 566 U.S. 284, 290 (2012) (stating that a waiver of sovereign immunity must be expressed in statute, not legislative history); *Cunningham*, 2021 WL 821467, at *2 (recognizing that a waiver of sovereign immunity must be "unequivocally expressed in statutory text").  Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its sovereign immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction."  (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions."  *Passaro*, 935 F.3d at 248 (citing *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 71 n.14 (1996)).  And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law.  To qualify for this exception to sovereign immunity, a claim must be lodged against a state official and "'alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective.'"  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (brackets added) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997)).

**b.**

As mentioned, plaintiff concedes that sovereign immunity bars the FEPA claim against Sheriff Jenkins in his official capacity, but only to the extent that he acted as a "State Official." ECF 19 at 3.

In *Pense*, 926 F.3d at 99, a former employee of the Maryland Department of Public Safety and Correctional Services brought various antidiscrimination claims, including FEPA claims, against the Department.  The Fourth Circuit addressed "whether the State of Maryland, through a

statutory consent to suit provision, has waived its Eleventh Amendment immunity as to plaintiff Penses's FEPA claims." *Id.* at 101.  After reviewing the pertinent "statutory consent to suit provision" and a "separate venue provision" in FEPA, the Court concluded that the State of Maryland has not expressly consented to suit in federal court under FEPA. *Id.*  Therefore, Eleventh Amendment immunity applies to FEPA claims against the State brought in federal court. *Id.* (citing, *inter alia*, *Atascadero*, 473 U.S. at 241); *see O'Connell v. Rahn*, SAG-18-2515, 2020 WL 1929436, at *7 (D. Md. Apr. 21, 2020) (citing *Pense*).

But, Sgt. Ensor contends that the Sheriff is properly deemed a local official, not an agent of the State, for purposes of Count II.  ECF 19 at 3.  In her view, the issue is governed by the four-factor test articulated in *Ram Ditta*, 822 F.2d at 457.  And, she claims that under that test, "three of the four criteria all weigh heavily against Eleventh Amendment immunity . . . ."  ECF 19 at 5.

Conversely, the FCSO Defendants insist that "Sheriff Jenkins is a State constitutional officer, and the Eleventh Amendment provides him immunity from Sgt. Ensor's official-capacity FEPA claim."  ECF 21 at 3.  They posit that the *Ram Ditta* analysis is inapplicable here.

Defendants argue that "this Court has already rejected the *Ram Ditta* test as 'unnecessary' when evaluating a sheriff's personnel decisions, 'because Maryland statutory and case law expressly treat sheriffs as state employees with authority to make personnel decisions concerning deputy sheriffs.'"  ECF 21 at 4 (quoting *McGrath-Malott v. Maryland*, No. RDB-06-879, 2007 WL 609909, at *5 (D. Md. Feb. 23, 2007)).

*Lane*, 660 Fed. App'x 185, is instructive.  There, the Fourth Circuit concluded that the district court erred in failing to apply *Ram Ditta* to determine whether the Sheriff of Baltimore City was state or local in character for purposes of the Eleventh Amendment. *Id.* at 195-96.  In

particular, the *Lane* Court specified that the treatment of sheriffs under state law "is only part of the analysis" that ought to have been applied. *Id.* at 196.[14]

According to defendants, *Ram Ditta* only applies in the context of official capacity claims arising under federal law. But, they do not offer any legal authority to support that proposition. Rather, they cite to various decisions in which courts applied *Ram Ditta* to determine whether officials were immune from suit as to federal claims. *See* ECF 21 at 5. None of those cases states that *Ram Ditta* can simply be ignored when a State-law claim is at issue.

Therefore, I shall apply the *Ram Ditta* test to the facts here. In any event, the FCSO Defendants also argue that, even if *Ram Ditta* applies, "the plain result is that Sheriff Jenkins is a state official." ECF 21 at 6.

To determine whether an entity is sufficiently connected to a state for purposes of immunity, the Fourth Circuit has identified four factors to be considered: (1) whether the state will pay a judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether [the entity] is involved with local versus statewide concerns,'" and (4) "'how [the entity] is treated as a matter of state law.'" *Lane*, 660 F. App'x at 195 (alterations in original) (some alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457-58).

As to the fourth factor, it is pertinent that under Maryland's Constitution county sheriffs are constitutional officers. *See* Md. Const., Art. 4, § 44. Indeed, it is well settled under Maryland law that, as a general rule, county sheriffs and their deputies are deemed "officials and/or employees of the State of Maryland," rather than their county. *Rucker v. Harford County*, 316 Md. 275, 281, 558 A.2d 399, 402 (1989); *see Willey v. Ward*, 197 F. Supp. 2d 384, 387–88 (D.

---

[14] It is curious that the FCSO Defendants contend that *Ram Ditta* is inapplicable given that they cite *Lane*, 660 F. App'x 185. *See* ECF 21 at 4.

Md. 2002); *see also Prince George's County v. Aluisi*, 354 Md. 422, 731 A.2d 888, 895 (1999) ("Sheriffs and deputy sheriffs are state officials, not local government officials, and their duties are determined by state law, not locally enacted ordinances."); *Rossignol v. Voorhaar*, 321 F. Supp. 2d 642, 651 (D. Md. 2004) (discussing *Rucker*, 558 A.2d at 399, and noting that "Maryland's highest court has previously engaged in a detailed analysis of Maryland's Constitution and Code to conclude that a sheriff and his deputies are not state employees.").

Moreover, for purposes of civil liability, Maryland courts ordinarily treat sheriffs as state officials. *See, e.g. Barbre v. Pope,* 402 Md. 157, 173, 935 A.2d 699, 709 (2007); *Lee v. Cline,* 384 Md. 245, 265–66, 863 A.2d 297, 309 (2004); *Wolfe v. Anne Arundel County,* 374 Md. 20, 33–34 & n. 6, 821 A.2d 52, 60 & n. 6 (2003); *Aluisi,* 354 Md. at 434, 731 A.2d at 895; *Ritchie v. Donnelly,* 324 Md. 344, 357, 597 A.2d 432, 438 (1991); *Boyer v. State,* 323 Md. 558, 572–73, 594 A.2d 121, 128 (1991); *Penhollow v. Bd. of Comm'rs for Cecil County,* 116 Md. App. 265, 296, 695 A.2d 1268, 1284–85 (1997); *State v. Card,* 104 Md. App. 439, 441–47, 656 A.2d 400, 401–04, *cert. denied,* 339 Md. 643, 664 A.2d 886 (1995). And, this Court has often taken the view that Maryland sheriffs are State, not county, actors. *See, e.g.*, *Ledergerber v. Blubaugh*, JKB-20-1208, 2020 WL 7029868, at *4 (D. Md. Nov. 30, 2020); *Santos v. Frederick Cty. Bd. of Commissioners*, 346 F. Supp. 3d 785, 799 (D. Md. 2018); *Rossignol*, 321 F. Supp. 2d at 649–51; *Willey*, 197 F. Supp. 2d at 387–88; *see also Lindsey v. Jenkins,* RDB–10–1030, 2011 WL 453475, at *3 (D. Md. Feb. 3, 2011); *Jiggets v. Forever 21,* AW–08–1473, 2010 WL 5148429, at *2 (D. Md. Dec. 13, 2010); *D'Alessandro v. Montgomery County,* PJM–08–2841, 2009 WL 2596479, at *2 (D. Md. Aug. 14, 2009); *Hayat v. Fairely,* WMN–08–3029, 2009 WL 2426011, at *10 (D. Md. Aug. 5, 2009).

However, the Maryland Court of Appeals has allowed that, "for some purposes and in some contexts, a sheriff may . . . be treated as a local government employee." *Rucker*, 316 Md. at 289,

558 A.2d at 406.  This pertains to issues involving "local funding of sheriff's offices" or a sheriff's entitlement to local government employee benefits.  *Id.*; *see Santos*, 346 F. Supp. 3d at 799.

Sgt. Ensor does not dispute that the fourth factor weighs in favor of the FCSO Defendants' position.  *See* ECF 19 at 5.  But, she insists that the other three factors support her position.  *Id.* Yet, plaintiff does not actually engage in the *Ram Ditta* analysis.  *See id.* at 3-5.  Rather, in a blanket statement, she incorporates arguments set forth in her opposition to the County Motion, *id.* at 3, addressing a separate issue—namely, whether the County is a proper defendant to this suit. *See* ECF 18.   That submission did not address the *Ram Ditta* framework.

As to the first factor, the FCSO Defendants assert that "the State is the only entity that bears financial responsibility for an official capacity judgment here."  ECF 21 at 6.  In their view, because the first factor weighs in their favor, the analysis need go no further.  For that proposition, they quote *Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir. 1996), which explained: "[I]f the state treasury will pay the judgment, the entity is immune from suit, and the other *Ram Ditta* factors need not be considered." (Brackets added.); *see also Gray v. Laws*, 51 F.3d 426, 431 (4th Cir. 1995) (reasoning that one of the primary concerns underpinning the Eleventh Amendment is that "federal court judgments not deplete state treasuries and that the sovereign 'dignity' of the states be preserved") (citation omitted); *Doe v. Coastal Carolina Univ.*, 359 F. Supp. 3d 367, 379 (D.S.C. 2019) (citing *Harter*); *Panowicz v. Hancock*, DKC 11-2417, 2012 WL 4049358, at *6 (D. Md. Sept. 12, 2012) (stating that the "principal factor, upon which courts have virtually always relied" in determining whether an official is State or local in character "is whether a judgment against the governmental entity would have to be paid from the State's treasury") (citation omitted); *DeBauche v. Virginia Commonwealth Univ.*, 7 F. Supp. 2d 718, 722 (E.D. Va. 1998) (citing *Harter*), *aff'd sub nom. DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999).

In support of the contention that the State will pay a judgment against Sheriff Jenkins in his official capacity, the FCSO Defendants lead with a citation to Md. Code (2014 Repl. Vol.), S.G. §§ 12-401(12)-(13), 12-404. Titled "Payment authorized," S.G. § 12-404 provides:

> Subject to the limitations in this subtitle, the Board of Public Works may:
>
> > (1) pay wholly or partly a settlement or judgment against the State or any State personnel; and
> >
> > (2) include, in the payment, counsel fees and costs.

And, S.G. § 12-401, titled "'State personnel' defined," provides, in relevant part:

> In this subtitle, "State personnel" means:
>
> > \*\*\*
> >
> > (12) any other individual who, with or without compensation, holds a position that requires the exercise of discretion and of a part of the sovereignty of the State;
> >
> > (13) any other State officer or State employee;

The FCSO Defendants do not offer any analysis of these provisions or cite any case law addressing their meaning. Rather, defendants appear to assume that under the plain language of § 12-401(12), (13), the sheriff of a county falls within the definition of "State personnel." Their brief does not include any discussion of the statutory text, the statutory scheme, or other "surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Johnson v. Mayor & City Council of Baltimore*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013); *see Conaway v. State*, 464 Md. 505, 522, 212 A.3d 348, 358 (2019) (discussing principles of interpretation of Maryland statutes).

But, S.G. § 12-405, titled "Limitations," makes clear that sheriffs are included in the definition of "State personnel" for purposes of §§ 12-401 to 12-405. Section 12-405(b) is titled "Requirements for payment." It specifies the procedures for payment of settlements and

judgments against State personnel.  *See Rodriguez v. Cooper*, 458 Md. 425, 455, 182 A.3d 853, 871 (2018) (discussing the statutory framework setting forth the procedure generally for payment of judgments against State personnel).  Of relevance here, S.G. § 12-405(b)(5) addresses specific requirements for payment "on behalf of a sheriff or deputy sheriff of a county or Baltimore City."  Thus, S.G. § 12-401, read in tandem with S.G. § 12-405, recognizes that sheriffs qualify as State personnel.[15]

Generally, a State employee who believes a settlement or judgment is the responsibility of the State must submit an application for payment to the Board of Public Works.  S.G. § 12-405(b).  However, § 12-405(a), titled "Restrictions on payment," establishes certain exceptions for certain claims, as follows:

> a) *Exceptions to certain application requirements.* — The application requirements enumerated in subsection (b)(5) of this section do not apply to claims relating to:
>
> (1) courthouse security;
>
> (2) service of process;
>
> (3) the transportation of inmates to or from court proceedings;
>
> (4) personnel and other administrative activities;
>
> (5) activities, including activities relating to law enforcement functions, arising under a multijurisdictional agreement under the supervision and direction of the Maryland State Police or other State agency; or
>
> (6) any other activities, except for activities relating to performing law enforcement functions or detention center functions.

---

[15] Similarly, the Maryland Tort Claims Act, which falls within a separate subtitle of Title 12 of the State Government Article, expressly defines "a sheriff or deputy of a sheriff of a county or Baltimore City" as "State personnel."  S.G. § 12-101(6).  Although that definition applies only to the statutory subtitle consisting of §§ 12-101 to 12-110, it is noteworthy for its consistency with S.G. § 12-405.

The provisions of § 12-405(a)(1)-(6) are identical to those of Md. Code (2015 Repl. Vol.), § 9-108(a)(1)-(6) of the State Finance and Procurement Article ("S.F.P.") and S.G. § 12-501(a)(2)(i)-(vi). Section 9-108 of the S.F.P. is titled "Coverage and defense for personnel other than those providing courthouse security, serving process, or transporting inmates." Among other things, it does not apply to a sheriff or deputy sheriff engaged in such activities. *See* S.F.P. § 9-108(a). In particular, the statute provides that Maryland's counties must either maintain insurance to provide "coverage and defense" of certain tort claims against sheriffs and their deputies or reimburse the State for the cost of the claims. *See Dotson v. Chester*, 937 F.2d 920, 927 (4th Cir. 1991).

Courts have recognized that the lists set forth in S.G. § 12-405(a) and S.F.P. § 9-108 identify State functions. *See Lane*, 660 F. App'x at 198 (citing S.F.P. § 9-108 for the proposition that, "pursuant to the Maryland Tort Claims Act, the state of Maryland, and not Baltimore City, is liable for tort claims against a sheriff for those claims relating to 'personnel and other administrative activities'"); *Dorsey v. Sokoloff*, 381 F. Supp. 3d 521, 535 (D. Md. 2019) (explaining that for "the purposes of determining whether the state or county is liable for any tort judgment, sheriffs' deputies act as <u>state</u> employees when they are engaged in" the activities listed in S.F.P. § 9-108(a)) (emphasis in original); *Ben v. Moskal*, DKC-17-3054, 2019 WL 4324276, at *9 (D. Md. Sept. 12, 2019) (citing both statutes and stating that a sheriff's provision of "transportation of a prisoner to and from court for trial . . . is by statute a state function"); *aff'd*, 801 F. App'x 205 (4th Cir. 2020); *McGowan v. Prince George's Cty., Maryland*, 401 F. Supp. 3d 564, 575 n.13 (D. Md. 2019); *Santos*, 346 F. Supp. 3d at 799 n.8.

Sheriff Jenkins's involvement in the facts underlying this suit, in his official capacity as Sgt. Ensor's employer, pertained to "personnel and other administrative activities" within the

meaning of the statutes cited above.  In her FEPA claim, plaintiff asserts that the internal investigation into her involvement in the Dobre Brothers' video and the disciplinary consequences of that investigation constituted unlawful discrimination on the basis of sex.  *See* ECF 3, ¶¶ 46-53. As noted, she was charged with—and ultimately admitted to—abusing her position, neglecting her duties, and incompetence, in violation of the FCSO's rules.  *See* ECF 13-5; ECF 13-6.  Clearly, the facts pertained to the application against her of FCSO's internal policies and procedures for personnel.  Indeed, plaintiff does not argue otherwise in her opposition.

As mentioned, plaintiff opposes Sheriff Jenkins's sovereign immunity argument by incorporating her opposition to the County Motion.  And, she does not apply the *Ram Ditta* analysis in either brief.  In proceeding in this fashion, she tangles the two sets of issues.  More important, plaintiff's opposition to the County Motion does not cite any legal authority that undermines the conclusion that, pursuant to S.G. §§ 12-404, 12-405, 12-501, and S.F.P. § 9-108, the State would pay a settlement or judgment against Sheriff Jenkins based on conduct in his official capacity.  *See* ECF 18 at 4-7.

In light of this conclusion, coupled with the conclusion as to the fourth factor, I need not address the remaining *Ram Ditta* factors.  *See Harter*, 101 F.3d at 337; *Gray*, 51 F.3d at 431; *Coastal Carolina Univ.*, 359 F. Supp. 3d at 379; *Panowicz*, 2012 WL 4049358, at *6; *DeBauche*, 7 F. Supp. 2d at 722.  I conclude that state sovereign immunity bars Count II against Sheriff Jenkins in his official capacity.  Therefore, I shall dismiss Count II as to Sheriff Jenkins in his official capacity.

### 5.  Title VII Analysis

I next address whether Count I states a claim of disparate treatment on the basis of sex, in violation of Title VII.

**a.**

As a preliminary matter, I begin with the issue of exhaustion.

To assert a Title VII claim in federal court, a plaintiff must first exhaust her administrative remedies. *See Davis*, 139 S. Ct. at 1846, 1850; *McCray*, 662 F. App'x at 224. To satisfy this requirement, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days "after the alleged unlawful employment practice occur[s]." 42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc*., 370 F.3d 423, 428 (4th Cir. 2004). But, because Maryland is a deferral state, a claim must be filed no more than 300 days after the alleged unlawful employment practice. *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc*., 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F. Appx 256 (4th Cir. 2008).

Upon receiving a charge, the EEOC must notify the employer and investigate the allegations. 42 U.S.C. § 2000e–5(b). If the EEOC finds "reasonable cause" to believe the charge is true, the EEOC must "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.* If the EEOC cannot achieve a voluntary settlement, it may "bring a civil action" against the employer in court. *Id.* § 2000e–5(f)(1). On the other hand, where the EEOC concludes that there is "n[o] reasonable cause to believe that the charge is true," Title VII directs the EEOC to dismiss the charge and notify the complainant of his right to sue in court. *Id.* § 2000e–5(b), f(1). This notice is commonly called a "right-to-sue letter." *See, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006). Of relevance here, a complainant has 90 days to file suit in federal or state court after being notified of the right to sue. *Id.* § 2000e–5f(1).

The Supreme Court recently held that a plaintiff's failure to exhaust administrative remedies does not divest the court of jurisdiction. *Davis*, 139 S. Ct. at 1846. Rather, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'" *Id.* (cleaned up) (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)). Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6). *See Kenion v. Skanska USA Bldg., Inc*., RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

The Fourth Circuit has admonished that the exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst*., 429 F.3d 505, 510 (4th Cir. 2005). Administrative exhaustion advances the complementary goals "of protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks and alterations omitted); *see also Balas v. Huntington Ingalls Indus., Inc*., 711 F.3d 401, 406-07 (4th Cir. 2013). In particular, the exhaustion requirement "ensures that the employer is 'put on notice of the alleged violations' to facilitate out-of-court resolution[.]" *Stewart*, 912 F.3d at 699 (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005)).

Moreover, Title VII's administrative exhaustion process has substantive effect. Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Blog*, 162 F.3d 795, 800 (4th Cir. 1998); *Techs. Applications & Serv. Co*., 80 F.3d at 963. However, because "EEOC charges often are not completed by lawyers,"

the Fourth Circuit has instructed courts to "construe them liberally." *Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Federal courts may hear claims not presented to the EEOC so long as they are "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Stewart*, 912 F.3d at 705. Thus, courts in the Fourth Circuit have declined to enforce blindly the requirement that a Title VII claim may only proceed against the respondent named in a plaintiff's EEOC charge. *See EEOC v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 603-05 (M.D.N.C. 2020) (collecting cases).

The FCSO Defendants contend that the portion of Count I that concerns the alleged discriminatory treatment of plaintiff by Lt. Null after her transfer to Judicial Services falls "outside Sgt. Ensor's EEOC charge . . . ." ECF 13-1 at 15. Thus, in their view, plaintiff has failed to exhaust her administrative remedies as to those allegations. *Id.* Plaintiff does not address the matter in her opposition.

In plaintiff's Charge, filed on March 19, 2019, she alleged discrimination based on sex. ECF 13-7 at 2. The Charge was signed by plaintiff; it does not appear to have been filed by counsel. *Id.* As mentioned, the narrative portion of the Charge states, in pertinent part, that plaintiff "was disciplined and suspended for violating department policies," and that Lt. Eyler, a male colleague "who committed a similar violation," was "not disciplined or suspended." *Id.* Although plaintiff filed the Charge after her transfer to Judicial Services, the narrative does not address the transfer. *See* ECF 3, ¶ 27; ECF 13-7 at 2. And, the only date identified in the Charge is November 15, 2018, when plaintiff was "disciplined and suspended . . . ." ECF 13-7 at 12.

51

In her suit, plaintiff claims that her treatment with regard to the reassignment to Judicial Services constituted discrimination on the basis of sex.  Given that the Charge was not filed by a lawyer, I must construe the Charge liberally.  *Chacko*, 429 F.3d at 509.  Broadly speaking, the allegations of sex discrimination in the suit with respect to the transfer are related to the claim of sex discrimination in the Charge.  Arguably, the allegations in the suit would have been "'expected to follow from a reasonable administrative investigation . . . .'"  *Sydnor*, 681 F.3d at 594 (citation omitted).

Under all of the circumstances, the allegations in Count I as to Judicial Services are "'reasonably related'" to the Charge.  *Sydnor*, 681 F.3d at 594 (citation omitted).  Accordingly, I conclude that plaintiff has satisfied the exhaustion requirement as to her claims of disparate treatment.  Nevertheless, as discussed below, the claim is deficient.

**b.**

The elements of a prima facie case of discrimination are as follows: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Coleman*, 626 F.3d at 190.

The FCSO Defendants acknowledge that plaintiff is a member of a protected class.  ECF 13-1 at 17.  And, they "assume for the purposes of [their motion] that she was subject to an adverse employment action," *id.*, although they "reserve rights" to argue otherwise. *Id.* at 17 n.7.  They do not specify what constituted the adverse employment action.

Of import here, the FCSO Defendants insist that the Amended Complaint does not satisfy the remaining elements of a prima facie case of discrimination.  First, the FCSO Defendants contend that Sgt. Ensor has not adequately alleged that her job performance was satisfactory until

the adverse employment action.  ECF 13-1 at 17.  In their view, the allegations set forth in ¶ 15 of

the Amended Complaint are insufficient to allege satisfactory job performance.  ECF 13-1 at 19.

Paragraph 15 states, ECF 3, ¶ 15:

Sgt. Ensor began her employment with FCSO on or about October 13, 2002 as a
Deputy Sheriff in the Law Enforcement Division.  She has been a hard-working
employee with FCSO for 18 years, regularly receiving accolades and "attaboys"
from both internal and external contacts complimenting her for a job well done.  At
all relevant times, Sgt. Ensor was performing her job to, and above, FCSO's
legitimate expectations.  Her performance evaluations have been excellent. She
never had a bad evaluation until the 35B quarterly evaluation written by Lt. Null
for the first quarter of 2019, which was the result of discrimination and retaliation
against Sgt. Ensor for pursuing her employment rights.

The FCSO Defendants draw primarily on four cases in which allegations of satisfactory

job performance were ruled insufficient.  *See* ECF 13-1 at 18; ECF 21 at 8.  But, those cases are

distinguishable.  In *Goode v. Cent. Virginia Legal Aid Soc.*, No. 3:14-CV-281-HEH, 2014 WL

3945870, at *1, 4-5 (E.D. Va. Aug. 12, 2014), the plaintiff's allegations did not allege satisfactory

job performance over a time span that ended at the time of the adverse employment action.  The

allegations addressed job performance in 2009, but the adverse action occurred in 2013.  *Id.*

Likewise, the plaintiff in *Mason v. Montgomery Cty.*, PWG-13-1077, 2015 WL 3891808, at *5 (D.

Md. June 23, 2015), failed "to allege a timeframe."

In contrast, Sgt. Ensor alleges that she received a negative performance evaluation in "the

first quarter of 2019," which was the first time in over sixteen years.  ECF 3, ¶ 15.  And, it occurred

around the time that she admitted to the charges against her and was subsequently disciplined.  *See*

*id. ¶* 27; ECF 13-6.

Moreover, plaintiff's allegations have more heft than those deemed to be insufficient in the

other cases cited by defendants.  *See Bynum v. Martin*, GJH-16-2067, 2016 WL 7468050, at *5

(D. Md. Dec. 27, 2016) ("Plaintiff merely alleges that 'at all times prior to August 13, 2014[,]

Plaintiff was at least a fully successful performer.'") (brackets added); *Young v. Giant Food Stores,*

*LLC*, 108 F. Supp. 3d 301, 313 (D. Md. 2015) ("Young acknowledges that she did not expressly plead that she was satisfying her employer's reasonable expectations, but . . . argues that the mere fact that she remained employed by Giant for over seven years provides an inference that she was meeting her employer's reasonable expectations.")

In my view, Sgt. Ensor has adequately alleged the element of satisfactory job performance, insofar as Count I is based on allegations regarding the investigation and resulting discipline. However, to the extent that Count I concerns the treatment of plaintiff by Null in Judicial Services, *see* ECF 3, ¶¶ 43, 45, plaintiff has not sufficiently alleged satisfactory job performance. As noted, plaintiff received a negative performance evaluation from Null "for the first quarter of 2019." *Id.* ¶ 15. Her assertion that the evaluation "was the result of discrimination and retaliation" is conclusory. Therefore, it need not be accepted for its truth. And, she does not offer anything else about her performance in Judicial Services to suggest that, despite the negative evaluation, she was performing satisfactorily. Plaintiff's blanket assertion that she was meeting or exceeding expectations at "all relevant times" is insufficient.

Defendants also maintain that plaintiff has not adequately alleged disparate treatment from similarly situated comparators. ECF 13-1 at 19. A plaintiff is "not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010), *cert. denied*, 562 U.S. 1219 (2011); *see Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003). But where, as here, "a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate at trial that the comparator is similarly situated in all relevant respects. *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th

Cir. 2017); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam); *Haywood*, 387 F. App'x at 359; *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

Therefore, a plaintiff must allege facts showing that she is "similar in all relevant respects to [her] comparator." *Haywood*, 387 F. App'x at 359. This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014) (per curiam).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani*, 767 F. App'x at 420. Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 F. App'x at 748 (citation omitted); *see, e.g.*, *Lightner*, 545 F.3d at 265 (rejecting comparison evidence as "too loose" because plaintiff and comparator held different job positions). Thus, a complaint's conclusory assertions that the plaintiff and a co-worker are on equal footing is insufficient to nudge a discrimination claim across the line from conceivable to plausible. *See Swaso*, 698 F. App'x at 748; *Sanchez v. Whole Foods Mkt.*, GJH-18-3106, 2019 WL 3717771, at *4 (D. Md. Aug. 5, 2019); *Bowen v. Md. Dept. of Pub. Safety & Corr. Servs.*, RBD-17-1571, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

The Amended Complaint includes allegations as to three comparators.  *See* ECF 3, ¶¶ 30, 31, 36.  Plaintiff alleges that Sheriff Jenkins exercised "day-to-day supervision of FCSO personnel," which includes the three comparators.  *Id.* ¶ 3.

With respect to two of the comparators, male officers within the FCSO, plaintiff alleges that they engaged in serious misconduct and either received more lenient punishments than she did or escaped punishment entirely.  *See* ECF 3, ¶¶ 30, 31.  One of the two, Officer Doe, allegedly committed constitutional violations during a "search and seizure", for which he was merely suspended for two weeks without pay.  *Id.* ¶ 30.  The other comparator, Officer Smith, engaged in allegedly criminal conduct—essentially, breaking and entering—while intoxicated.  *Id.* ¶ 31.  But, according to the Amended Complaint, he was never sanctioned.  *Id.*

The third comparator addressed in the Amended Complaint, Lt. Eyler, allegedly participated in a prank while on duty—a false, staged arrest of a young woman at a church.  *Id.* ¶ 36.  And, according to plaintiff's allegations, Lt. Eyler was never reprimanded or punished, let alone investigated, for that incident.  *Id.*

According to the FCSO Defendants, the staged arrest in which Lt. Eyler participated is clearly distinguishable from the facts pertaining to the video.  They emphasize that Lt. Eyler "responded to a genuine call for service" and that the incident in the Church was not recorded and made available on YouTube.  ECF 13-1 at 20.  But, these contentions miss the forest for the trees.  While on duty, both Sgt. Ensor and Lt. Eyler indulged in a prank or stunt at the behest of a young person, which leveraged the power of their uniform and badge to create the false appearance of an arrest.  Both stunts were intended for an audience: the Dobre Brothers' YouTube followers in plaintiff's case, and the church attendants in Lt. Eyler's case.  The size difference between the two audiences does not render the underlying conduct meaningfully different for purposes of the

comparator analysis. *See Haywood*, 387 F. App'x at 359 (emphasizing the similarity in *conduct* between plaintiff and comparator). Moreover, it is plausible that a church attendant watching Lt. Eyler walk a young woman in handcuffs down the aisle could have taken out a cell phone, recorded the spectacle, and later posted the recording on social media.

Plaintiff relies primarily on *Merritt*, 601 F.3d 289, for the proposition that "workplace culture can be relevant" to the disparate treatment analysis. ECF 19 at 14. Certainly, the facts of that case bear little resemblance to the allegations here. In *Merritt*, a woman employed as a truck driver asserted a Title VII disparate treatment claim on the grounds that she was subjected to a physical ability test after suffering an injury, while two male colleagues were not. *Id.* at 291, 293, 298-99. Moreover, the posture of the case was different—the Fourth Circuit focused extensively on the comparator evidence in the summary judgment record. The Court found that the two male comparators were exempted from the policy applied to the plaintiff under circumstances that were otherwise similar to those of the plaintiff. *See id.* at 298-99.

However, the *Meritt* Court also explained that, in certain circumstances, facts regarding the workplace culture or environment might inform the disparate treatment analysis. The Court cautioned that "the most unfortunate expressions and beliefs" and "stray or isolated remarks" made by coworkers should not necessarily be attributed to the "ultimate decision maker." *Id.* at 301. But, the Court also recognized that evidence of "'a discriminatory attitude at the workplace'" can establish a "'nexus between that negative attitude and the employment action.'" *Id.* (quoting *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (2007)).

Here, plaintiff alleges that in the Sheriff's Office "she has been treated differently because she is a woman." ECF 3, ¶ 32. Over the years, she has allegedly been solicited for sex by a superior and denied the opportunity to work overtime when she was pregnant. *Id.* ¶¶ 32, 33.

Further, Sheriff Jenkins himself "has publicly expressed that females should not be in supervisory or command positions." *Id.* ¶ 14. And, he "talks about women in a derogatory manner. . . ." *Id.* Although these allegations are not the basis for the disparate treatment claims, they ought not be ignored. Rather, the assertions as to Count I "must be viewed in the context of the broader pattern" of discriminatory workplace attitudes described in the Amended Complaint. *Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cty.*, TDC-18-3821, 2019 WL 2929025, at *11 (D. Md. July 8, 2019); *see Merritt*, 601 F.3d at 301.

The FCSO Defendants may well prove, on the merits, that Lt. Eyler and plaintiff were not similarly situated. But, comparator questions "are inherently fact-based . . . ." *Hisp. Nat'l L. Enf't Ass'n NCR*, 2019 WL 2929025, at *11 (citing *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). At this stage, plaintiff's allegations as to Lt. Eyler "permit a plausible inference" that the investigation into her staged arrest and the resulting discipline were discriminatory. *Hisp. Nat'l L. Enf't Ass'n NCR*, 2019 WL 2929025, at *11.

Therefore, I shall deny the FCSO Motion as Count I, lodged against Sheriff Jenkins in his official capacity, to the extent that Count I is based upon allegations regarding the investigation and resulting discipline. Insofar as Count I concerns the treatment of plaintiff by Null in Judicial Services, I shall grant the FCSO Motion, without prejudice, and with leave to amend.

## B. FMLA (Count III, Count IV, Count V)

As indicated, in Count III plaintiff alleges "Unlawful Interference and Denial of FMLA Benefits Due to Transfer/Demotion in Violation of 29 U.S.C. § 2615(a)(1)." *Id.* at 21. In both Count IV and Count V, plaintiff asserts "Discrimination/Retaliation for taking FMLA Leave in Violation of 29 U.S.C. §2615(a)(2)." *Id.* at 23, 25. Count IV concerns leave taken by plaintiff in October 2018. *Id.* ¶ 74. Count V pertains to leave taken by plaintiff in March 2020. *Id.* ¶ 84, 85.

### 1. Sovereign Immunity

Both plaintiff and the FCSO Defendants appear to agree that Sgt. Ensor took FMLA leave in the fall of 2018 and the spring of 2020, pursuant to the FMLA's "self-care" provision, 29 U.S.C. § 2612(a)(1)(D), despite the fact that the provision is not invoked in the Amended Complaint.  *See* ECF 13-1 at 23; ECF 19 at 15.  And, both sides also agree that, per the Supreme Court's decision in *Coleman*, 566 U.S. at 43, state officials enjoy sovereign immunity from suit for violation of that statutory provision when sued in their official capacity.  *See* ECF 13-1 at 23; ECF 19 at 15; *see also Sullivan v. Texas A&M Univ. Sys.*, 986 F.3d 593, 596 (5th Cir. 2021) (citing *Coleman* for the same proposition); *Woods v. S.C. Dep't of Health & Hum. Servs.*, 3:18-834-MGL, 2020 WL 614076, at *3 (D.S.C. Feb. 10, 2020) (same), *aff'd*, 811 F. App'x 199 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 685 (2020); *Hayes v. Maryland Transit Admin.*, RDB-18-0691, 2018 WL 5809681, at *5 (D. Md. Nov. 6, 2018) (same), *aff'd sub nom. Hayes v. Gorman*, 748 F. App'x 519 (4th Cir. 2019).

Plaintiff again urges the conclusion that because defendants acted as local officials, not arms of the State, they are not entitled to Eleventh Amendment immunity as to her official capacity FMLA claims.  ECF 19 at 15-16.  However, she offers little analysis to support her claim.  *See id.*

The Court's conclusion regarding state sovereign immunity, as applied to the FEPA claim, controls here.  Various Maryland statutes make clear that, in regard to personnel and administrative matters, a sheriff of a Maryland county or of Baltimore City generally engages in a State function, and the State is responsible for payment of associated settlements or judgment.  And, because the State is responsible for such payment, the sheriff is a State official for purposes of the *Ram Ditta* analysis.

Nevertheless, Sgt. Ensor points out that in the *ad damnum* clauses for Counts III, Count IV, and Count V of her Amended Complaint, she seeks injunctive relief, in addition to money damages. ECF 19 at 16; *see* ECF 3 at 23, 25, 27. Specifically, each clause asks for "reinstatement," among other things. ECF 3 at 23, 25, 27. Plaintiff explains that by "reinstatement" she means reinstatement to her prior post in Patrol Operations, which she held before being transferred to the County Courthouse in December 2018. *See* ECF 19 at 16.

According to plaintiff, her request for reinstatement in Counts III, IV, and V qualifies for the *Ex parte Young* exception to sovereign immunity. ECF 19 at 16. As noted, sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. *Ex parte Young*, 209 U.S. 123. To avoid the bar of the Eleventh Amendment, a claim for such relief must be lodged against a state official and "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc.*, 535 U.S. at 645 (brackets added).

The thrust of the Amended Complaint is that plaintiff's transfer to the County Courthouse, as part of the disciplinary action resulting from the internal investigation, amounted to a demotion. Defendants do not contend otherwise. But, the FCSO Defendants suggest that plaintiff's request for reinstatement does not qualify for the *Ex parte Young* exception because plaintiff's employment was not terminated. ECF 21 at 13. However, the Fourth Circuit recently reaffirmed in a case involving a demotion that "claims for reinstatement to previous employment" satisfy the *Ex parte Young* exception. *Biggs v. N. Carolina Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020) (collecting cases). Therefore, defendants cannot claim sovereign immunity strictly on the basis that plaintiff was not terminated.

In addition, the FCSO Defendants rely on *Jemsek v. Rhyne*, 662 F. App'x 206, 207 (4th Cir. 2016), to contend that plaintiff's request for reinstatement does not meet the *Ex parte Young* exception.  ECF 21 at 12-13.  In that case, plaintiff Joseph Jemsek, a North Carolina-licensed physician, was sanctioned in 2006 by the North Carolina Medical Board for misconduct.  *Id.* at 208.  Two years later, the Board again investigated Jemsek's medical practice.  *Id.*  During that investigation, the Board "informed Jemsek that, if he allowed his North Carolina medical license to become inactive, the Board would end the investigation."  *Id.*   Jemsek allowed his license to lapse and the Board issued a "public letter of concern" as to his conduct.  *Id.*

Thereafter, Jemsek filed suit against various defendants.  He sought declaratory and injunctive relief, claiming the 2006 sanction and the 2008 letter violated his constitutional rights, and seeking their rescission, among other things.  *Id.* at 209.  Of relevance here, the Fourth Circuit concluded that the plaintiff's claims against the members of the Board in their official capacity were barred by the Eleventh Amendment.  *See id.*  at 211-12.

In particular, the Court reasoned that the *Ex parte Young* doctrine was not applicable, notwithstanding the doctor's claim that because the sanctions "remain on the record, there is an ongoing violation . . . ."  *Id.* at 211.  The Court reasoned that the sanctions were "purely historical, not ongoing violations."  *Id.* at 212.  They were one-time events.  *Id.* at 211.  That the "disciplinary actions may have continuing consequences" did not necessarily render them ongoing in nature.  *Id.*  And, the Court noted that Jemsek himself "voluntarily allowed his medical license to become inactive," and was not seeking reinstatement of his license.  *Id.*

In light of *Jemsek*, the FCSO Defendants seek to characterize the disciplinary actions taken against Sgt. Ensor as one-time events.  They highlight that just as the *Jemsek* plaintiff voluntarily

allowed his license to lapse, so too did Sgt. Ensor admit to the charges against her and voluntarily accept the recommended sanctions. *See* ECF 21 at 12-13.

*Jemsek* is distinguishable. The plaintiff in *Jemsek* complained of a one-time sanction and a letter of reprimand issued against him by a state licensing board. In contrast, Sgt. Ensor's change in assignment was not a one-time event; rather, it is ongoing. And, she seeks reinstatement to her prior position.

Moreover, the *Jemsek* Court itself observed that in *Coakley v. Welch*, 877 F.2d 304 (4th Cir. 1989), the Fourth Circuit ruled that a terminated employee seeking reinstatement satisfied the *Ex parte Young* exception because termination prevented the plaintiff "'from obtaining the benefits of [state agency] employment.'" *Jemsek*, 662 F. App'x at 212 n.5 (brackets in *Jemsek*) (quoting *Coakley*, 877 F.2d at 307). And, the Fourth Circuit and district courts within the Fourth Circuit have recognized that a request for reinstatement to prior employment may meet the *Ex parte Young* exception. *See Bland*, 730 F.3d at 390 ("Because reinstatement is a form of prospective relief, the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the *Ex parte Young* exception applies.") (citing *Coakley*); *Bolden v. S.C. Dep't of Disabilities & Special Needs*, No. 219-CV-01079RMGMGB, 2020 WL 3848225, at *5 (D.S.C. Mar. 2, 2020), *report and recommendation adopted sub nom. Bolden v. S.C. Dep't of Disabilities & Special Needs*, No. CV 2:19-1079-RMG, 2020 WL 1921576 (D.S.C. Apr. 21, 2020) (same); *White v. Virginia Bd. for People with Disabilities*, No. 3:18-CV-360-JAG, 2019 WL 413546, at *3 (E.D. Va. Feb. 1, 2019) (citing *Bland*); *Bowen*, 2018 WL 1784463, at *5 (citing *Bland*).

Count III and Count IV assert that plaintiff's transfer to Judicial Services constituted a violation of the FMLA. Count V, on the other hand, concerns FMLA leave taken by plaintiff in March 2020, after her reassignment, and alleges deprivation of plaintiff's FMLA rights during a

time-bound period. Thus, Count V does not allege "an ongoing violation of federal law . . . ." *Verizon Md., Inc.*, 535 U.S. at 645. Therefore, I shall dismiss Count III, Count IV, and Count IV, to the extent that the claims are lodged against the FCSO Defendants in their official capacities and seek money damages. But, I decline to dismiss Count III and Count IV to the extent that the claims seek equitable relief in the form of reinstatement.[16]

### 2. Individual Liability

The FCSO Defendants ask the Court to side with "the vast majority of judges in this district" and conclude that the Family and Medical Leave Act does not provide for individual liability of supervisors at public agencies. ECF 13-1 at 23; *see, e.g.*, *Charles Mattison, Jr. v. Md. Transit. Admin., et al.*, Civ. No. RDB-15-1627, 2016 WL 2898020, at *5 (D. Md. May 18, 2016) (collecting cases). Conversely, Sgt. Ensor urges the Court to adopt the minority view, expressed in *Dennard v. Towson University*, 62 F. Supp. 3d 446 (D. Md. 2014), and *Reed v. Maryland, Dep't of Hum. Res.*, ELH-12-0472, 2013 WL 489985 (D. Md. Feb. 7, 2013). *See* ECF 19 at 17.

The parties do not offer any helpful analysis in support of their positions. In essence, each asks the Court simply to "pick a side." And, defendants do not address the issue at all in their reply.

In 2014, District Judge J. Frederick Motz observed that the Fourth Circuit had yet to opine on whether the FMLA creates a cause of action for money damages against individual supervisors

---

[16] In their reply, the FCSO Defendants summarily assert that if plaintiff's official capacity claims are permitted to proceed, they should be dismissed as to all defendants other than Sheriff Jenkins because only Jenkins, "as the appointing authority, can reinstate Sgt. Ensor to her prior position in Patrol Operations." ECF 21 at 14-15 (citing Md. Code (2020 Repl. Vol.), § 2-324(c) of the Courts and Judicial Proceedings Article, albeit without any additional discussion). This argument was not raised in the FCSO Motion. Therefore, I decline to consider it at this juncture. *See EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013) (stating that ordinarily "'an argument raised for the first time in a reply brief or memorandum will not be considered'") (citation omitted), *aff'd in part sub nom.*, *E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015).

at public agencies.  *See Dennard*, 62 F. Supp. 3d at 452 (citing *Jones v. Sternheimer*, 387 Fed. App'x 366, 368 (4th Cir. 2010)).  That was true as of 2016.  *See Corbett v. Richmond Metro. Transportation Auth.*, 203 F. Supp. 3d 699, 708 (E.D. Va. 2016).  And, to my knowledge, it remains so to this day.  Moreover, a circuit split exists as to this issue.

But, as multiple courts have observed, a majority of the circuits that have directly opined on the matter permit individual liability, as have many district courts.  *See MacIntyre v. Moore*, 335 F. Supp. 3d 402, 419 (W.D.N.Y. 2018) (explaining that the Sixth Circuit and Eleventh Circuits have rejected individual liability, whereas the Third Circuit, Fifth Circuit, and Eighth Circuit have adopted the theory; suggesting that the Seventh Circuit appears receptive to the theory; and joining "at least four district court decisions within the Second Circuit" in recognizing individual liability against public employees); *Evans v. California Comm'n on Peace Officers Standards & Traning*, 2:15-CV-01951-MCE-DB, 2018 WL 1425973, at *4 (E.D. Cal. Mar. 22, 2018) (noting the circuit split and observing that "although the Ninth Circuit has yet to weigh in, district courts within this circuit have consistently held that the FMLA imposes individual liability on public agency employees"); *see also Corbett*, 203 F. Supp. 3d at 708 (recognizing that judges in the Eastern District of Virginia have found in favor of individual liability); *Aguirre v. California*, 16-CV-05564-HSG, 2017 WL 5495953, at *8 (N.D. Cal. Nov. 16, 2017) ("Moreover, while district courts outside this circuit are split, a majority have found individual liability as well.").

In particular, the dispute over individual liability concerns 29 U.S.C. § 2611(4)(A), (B), in which the FMLA defines "employer" as follows:

> (A) In general. The term "employer"—
>
>> (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

(ii) includes—

(I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and

(II) any successor in interest of an employer;

(iii) includes any "public agency", as defined in section 3(x) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(x)); and

(iv) includes the General Accounting Office [now the Government Accountability Office] and the Library of Congress.

(B) Public agency.

For purposes of subparagraph (A)(iii), a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce.

According to the Third, Fifth, and Eighth circuits, and the many district courts that have adopted similar interpretations, §§ 2611(4)(A)(ii) and 2611(4)(A)(iii) ostensibly encompass any individual supervisor at a public agency. *See Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 414-17 (3d Cir. 2012); *Modica v. Taylor*, 465 F.3d 174, 184-87 (5th Cir. 2006); *Darby v. Bratch*, 287 F.3d 673, 680-81 (2002). The reasoning adopted in these cases is fairly straightforward. If the term "employer" includes a "public agency" under subparagraph (iii), then "any person who acts, directly or indirectly, in the interest of an employer," as provided under subparagraph (ii)(I), includes any person who acts in the interest of a "public agency." *See Haybarger*, 667 F.3d at 416. In other words, "if a public employee 'acts, directly or indirectly, in the interest of an employer,' he satisfies the definition of employer under the FMLA . . . ." *Modica*, 465 F.3d at 184.

In *Dennard*, 62 F. Supp. 3d at 453, Judge Motz summarized the contrary construction,

which was adopted in *Sadowski v. U.S. Postal Serv.*, 643 F. Supp. 2d 749 (D. Md. 2009), as follows

(brackets and ellipses added):

> The *Sadowski* court largely adopted and applied the Sixth Circuit Court of Appeals'
> justifications . . . to hold that FMLA does not define "employer" to include
> supervisors at public agencies. . . . Briefly summarized, the "strict" view interprets
> § 2611(4) as having "distinct and independent" subsections, meaning that one
> cannot include a public supervisor within the "employer" definition because it
> requires linking two separate subsections: (iii), "public agency," *and* subsection
> (ii)(I), the "supervisor" section. "Strict" view courts cite the analogous provision in
> the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* which defines
> "employer" in a single sentence to include "any person acting directly or indirectly
> in the interest of an employer in relation to an employee and includes a public
> agency." 29 U.S.C. § 203(d). Courts contrast that provision with § 2611(4), arguing
> that the latter purposefully placed "supervisor" and "public agency" into distinct
> subsections.
>
> In addition to § 2611(4)'s structure, "strict" view courts also note two anomalies
> that result from "co-mingling" the subsections. First, those courts argue that co-
> mingling subsections under (A) would render § 2611(4)(B) superfluous, because
> "public agency" in (A)(iii) would already be deemed "a person engaged in
> commerce" by co-mingling (A)(iii) with (A)(i). Second, "strict" view courts argue
> against co-mingling by noting that (ii)(II), the successor-in-interest provision,
> cannot be sensibly applied to subsections (iii) and (iv); the "public agency" and
> Government Accountability Office and the Library of Congress subsections,
> respectively. That is evidence, those courts argue, that Congress did not intend for
> one subsection to be applied to another.

But, Judge Motz proceeded to explain that the FMLA's implementing regulations support

the interpretation that § 2611(4) establishes individual liability of public employers. He stated,

*Dennard*, 62 F. Supp. 3d at 454 (brackets and ellipses added):

> [C]ourts cite 29 C.F.R. § 825.104(a)—promulgated by the U.S. Department of
> Labor—which states that "[e]mployers covered by FMLA also include any person
> acting, directly or indirectly, in the interest of a covered employer to any of the
> employees of the employer . . . and any public agency." That binding regulation
> collapses the distinct subsections of § 2611(4)(A) into one sentence, analogous to
> the FLSA statutory provision that does the same. *See Haybarger,* 667 F.3d at 414
> ("Accordingly, the FMLA regulations leave little doubt that individual liability is
> available under the FMLA").

*See also MacIntyre*, 335 F. Supp. 3d at 419 (reasoning similarly and citing *Darby*, 287 F.3d at 681 and *Cordova v. New Mexico*, 283 F. Supp. 3d 1028, 1039 (D.N.M. 2017)); *Reed*, 2013 WL 489985, at *10 (reasoning similarly).   Further, Judge Motz went on to refute other elements of the interpretation adopted by the Sixth and Eleventh Circuits.  *See Dennard*, 62 F. Supp. 3d at 454.

In sum, Judge Motz concluded that although "the contrary view is certainly plausible," interpreting § 2611(4)(A), (B) to create individual liability for public employees is the better "plain textual reading" and better harmonizes the FMLA's statutory scheme with that of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.  See Dennard*, 62 F. Supp. 3d at 454; *see also MacIntyre*, 335 F. Supp. 3d at 424 ("In sum, Defendants' position that a public official cannot be held individually liable as an 'employer' under the FLSA is contrary to the plain language of the statute . . . ."); *Bonzani v. Shinseki*, 895 F. Supp. 2d 1003, 1010 (E.D. Cal. 2012) (finding "that the similarity between the FMLA and the FLSA suggests that Congress intended the statutes to be treated the same").

Without any analysis or principled argument from the FCSO Defendants, I see no reason to depart from my conclusion in *Reed*, which the *Dennard* Court and others have reached. Therefore, I shall proceed to the merits of plaintiff's FMLA claims, to the extent that they are lodged against the FCSO Defendants in their individual capacities.

### 3.  The FMLA Generally

"The FMLA is intended 'to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons.'"  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 381 (4th Cir. 2001) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999)).  Under the FMLA, an "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for . . . a son, daughter, or

parent, of the employee, if such . . . son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). An employee is eligible if the employee "has been employed . . . (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). It is undisputed that plaintiff was an "eligible employee."

A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). "Continuing treatment" includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). "A chronic serious health condition is one which: (1) Requires periodic visits . . . for treatment . . . ; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." *Id.* In some cases, absences "attributable to incapacity" due to a chronic serious health condition "qualify for FMLA leave even though . . . the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack[.]" *Id.* § 825.115(f).

Under the FMLA, there are two types of claims: "(1) 'interference,' in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) 'retaliation,' in which the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Edusei v. Adventist Healthcare, Inc.*, DKC 13-0157, 2014 WL 3345051, at *5 (D. Md. July 7, 2014) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th

Cir. 2009)); *see also Fry v. Rand Construction Corporation*, 964 F.3d 239, 244 (4th Cir. 2020).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson*, 558 F.3d at 294-95; *see also Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013). Thus, courts have interpreted the FMLA to provide a cause of action for retaliation. *Dotson*, 558 F.3d at 295.

An interference claim "'merely requires proof that the employer denied the employee his entitlements under the FMLA[.]'" *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). In contrast, retaliation requires "'proof of retaliatory intent.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *Stallings*, 447 F.3d at 1051); *see also Edusei*, 2014 WL 3345051, at *6. In addition to refusing FMLA leave, interference includes "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

In Count III, Sgt. Ensor asserts an interference claim. And, in Count IV and Count V, she asserts retaliation claims.

### 4.  Count III (Interference)

To state a claim for unlawful interference under the FMLA, plaintiff must allege that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Sherif v. Univ. of*

*Maryland Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015) (quoting *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 495 (D. Md. 2013) (quotation marks omitted)).

In Count III, Sgt. Ensor alleges interference with the exercise of her FMLA rights in the fall of 2018. *See* ECF 3 at 21-22. In particular, plaintiff asserts that "serving her with an internal affairs investigation, requiring her to submit to an interrogation at Defendants' offices without pay during her leave time, and transferring her to Judicial Services at the conclusion of her leave rather than reinstating her in her same job or an equivalent position" constituted interference with the FMLA leave she took from October 1, 2018, to mid-December 2018. *Id.* ¶ 66; *see id.* ¶¶ 59-65.

The FCSO Defendants contend that the fifth element of an interference claim is not satisfied. Their position is that Sgt. Ensor was not denied the benefits of her fall 2018 FMLA leave. *See* ECF 13-1 at 25-26. For one, plaintiff does not allege that she was denied the right to take as much leave as she wished. *See id.* at 26. Indeed, she took roughly ten weeks of leave, spanning October 1, 2018 to December 16, 2018. ECF 3, ¶¶ 18, 27; ECF 13-5 at 4. And, according to the FCSO Defendants, being served at her home with notice of the internal investigation and participating in an interrogation did not amount to interference with plaintiff's enjoyment of her leave.

Defendants draw on *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427-28 (4th Cir. 2015), which addressed an FMLA interference claim that concerned a required meeting. Of relevance here, the plaintiff, a school administrator, became the subject of an administrative investigation into alleged misconduct conducted by the local school board. *Id.* at 425. Over the following months, the plaintiff took multiple periods of leave. *Id.* A "pre-disciplinary conference" arising out of the school board investigation was scheduled during one of these periods, which the plaintiff's attorney attended. *Id.* The *Adams* Court determined that the conference did not

constitute interference under the FMLA, reasoning: "In certain circumstances required meetings may unlawfully interrupt an employee's leave.  Here, however, the one-time conference was a legitimate piece of an ongoing investigation . . . ."  *Id.* at 427.

Moreover, the Court highlighted that the plaintiff was not denied "any FMLA leave he requested."  It said: "The Supreme Court has observed that the "'purpose of [an interference claim] is to permit a court to inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions.'"  *Id.* (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 532 U.S. 81, 91 (2002)) (brackets in *Adams*).

*Adams* is instructive.  Like the plaintiff in that case, Sgt. Ensor received as much leave time as she requested during fall 2018.   And, the interrogation was conducted pursuant to an investigation that was initiated around the time that plaintiff took leave on October 1, 2018.  Both the Amended Complaint and the exhibits make clear that the investigation concerned plaintiff's participation in the Dobre Brothers' video on September 29, 2018.

The authority on which plaintiff relies is not to the contrary.  She cites *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010), albeit without any discussion.  That case is plainly distinguishable, as it involved claims that an employer denied a plaintiff leave outright, *id.* at 585-86, and required excessive documentation to prove that he qualified for FMLA leave.  *Id.* at 587. Nor is her case strengthened by *Coleman v. Anne Arundel Cty. Police Dep't*, 136 Md. App. 419, 434, 766 A.2d 169, 177 (2001), *aff'd*, 369 Md. 108, 797 A.2d 770 (2002).  In that decision, the Maryland Court of Special Appeals affirmed the principle that "'if [the employee] would have been terminated because of poor work performance regardless of whether [he or] she took leave, then [the employer] did not violate FMLA.'"  136 Md. App. at 434, 766 A.2d at 177 (quoting

*Hubbard v. Blue Cross Blue Shield Ass'n,* 1 F.Supp.2d 867, 875 (N.D. Ill.1998) (brackets in *Coleman*).

Here, the Amended Complaint indicates that the alleged interference—the interrogation and service of notice of the investigation—would have occurred whether or not Sgt. Ensor took leave in October 2018.  Therefore, I shall grant the FCSO Motion as to Count III.

### 5.  Count IV (Retaliation)

The *McDonnell Douglas* burden-shifting framework applies to plaintiff's FMLA retaliation claim in Count IV because FMLA retaliation claims are analogous to Title VII retaliation claims.  *See, e.g. Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001).  The elements are as follows: "'(1) [the plaintiff] engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events.'"  *Fry*, 964 F.3d at 245 (quoting *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019)); *but see Strothers*, 895 F.3d at 327, discussed *infra*; *see also International Paper Co.*, 936 F.3d at 195; *Irani*, 767 Fed. App'x at 421; *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 233 (4th Cir. 2009); *Yashenko*, 446 F.3d at 551.

At trial, "[i]f a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'"  *Hoyle*, 650 F.3d at 337 (quoting *Yashenko*, 446 F.3d at 551); *see also Fry*, 964 F.3d at 245.

Plaintiff must first allege that she engaged in protected activity.  In *Fry*, 964 F.3d at 245, the Fourth Circuit explained: "We have read [29 U.S.C. § 2615(a)(2)] broadly to protect not just

employees who 'oppose' unlawful practices . . . but also to protect 'employees from discrimination or retaliation *for exercising their substantive rights under the FMLA*.'"   (Quoting *Yashenko*, 446 F.3d at 546) (emphasis in *Fry*; brackets and ellipses added).

The second element of the prima facie case is an "adverse action."   In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case.   (Emphasis added).   Therefore, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*   In other words, in a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

An action is adverse in the retaliation context if it might "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citations omitted); *see Hoyle*, 650 F.3d at 337.   By analogy, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray v. International Paper Co.*, 909 F.3d 661, 557 (4th Cir. 2018).   Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).   Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

To prove causation, the employee must establish that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of*

*Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Irani*, 767 Fed. App'x at 421; *Foster v. Univ. of Md. – E. Shore*, 87 F.3d 243, 252 (4th Cir. 2015).  The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [action] was pretextual."  *Netter*, 908 F.3d at 938 (brackets added); *see Foster*, 787 F.3d at 249.  In the Title VII context, "a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Nassar*, 570 U.S. at 362.

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).  Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'"  *Id.* (citation omitted).  Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'"  *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation.  "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'"  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's]

probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

As to Count IV, the FCSO Defendants first argue that Sgt. Ensor was not subjected to an adverse action.  ECF 13-1 at 28.  In their view, the internal investigation and the disciplinary action that it yielded do not qualify as adverse actions as a matter of law.  *Id.*  And, by extension, neither does the service of notice of the investigation at plaintiff's home on November 15, 2018.  *Id.*

Notably, defendants rely on cases that discuss whether workplace investigations constituted adverse employment actions for purposes of disparate treatment, rather than a retaliation claim.  *See id.* at 28-29 (citing *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 436-37 (D. Md. 2012); *Jenkins v. Baltimore City Fire Dep't*, 862 F. Supp. 2d 427, 445 (D. Md. 2012), *aff'd*, 519 F. App'x 192 (4th Cir. 2013); *Wilder v. Baltimore City Police Dep't*, AMD 07-3090, 2009 WL 10727178, at *4 (D. Md. May 19, 2009)).  As Judge Williams explained in *Blakes*, 909 F. Supp. 2d at 436-437, in the context of disparate treatment claims:

> Although an investigation of an employee may constitute an adverse employment action in certain circumstances, disciplinary investigations "reasonably rooted in articulable facts justifying such an investigation" typically do not rise to the level of adverse employment actions. . . .  Consistent with these authorities, several Circuits, including the Fourth, have come to the conclusion that the suspension of a police officer with pay pending the outcome of an internal investigation reasonably rooted in articulable facts does not constitute adverse employment action.

And, the *Jenkins* Court rejected a claim for "disparate investigation" on the ground that the plaintiffs failed to allege "that the investigation resulted in some form of employment injury that was independent of injury caused by the alleged disparate promotion or discipline." *Jenkins*, 862 F. Supp. 2d at 446.

Here, the investigation into Sgt. Ensor appears to have been "reasonably rooted in articulable facts justifying such an investigation." *Blakes*, 909 F. Supp. 2d at 437.  But, Sgt. Ensor was not merely suspended with pay.  Rather, she was suspended without pay for fifteen days, received a written reprimand, was deprived of her take home vehicle for thirty days, and was transferred from Patrol Operations to Judicial Services.  ECF 13-6.

Moreover, Count IV asserts an FMLA retaliation claim, not a claim for disparate treatment. As indicated, the standard for an adverse action in a retaliation claim is more lenient than for a substantive discrimination claim. *Burlington Northern*, 548 U.S. at 64.  "Adverse actions include, but are not limited to, 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion.'" *Osei v. Coastal Int'l Sec., Inc.*, 69 F. Supp. 3d 566, 573 (E.D. Va. 2014) (quoting *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  In my view, the consequences of the investigation, as alleged by plaintiff and supported by the exhibits, satisfy the lower threshold for adverse action in the retaliation context.

The FCSO Defendants also contend that even if plaintiff were subjected to an adverse action, she has not alleged a causal nexus between that adverse action and her FMLA leave in fall 2018.  ECF 13-1 at 29.  In plaintiff's opposition, she reviews several of the allegations in the Amended Complaint that pertain to the internal investigation and the ways in which it allegedly deviated from FCSO's standard operating procedures.  ECF 19 at 22-23.

However, allegations that the investigation might have been procedurally deficient or biased do not necessarily point to a causal nexus between the investigation and plaintiff's fall 2018 FMLA leave.  Indeed, both the Amended Complaint and the exhibits pertaining to the investigation indicate that the investigation arose out of and focused on plaintiff's participation in the Dobre Brothers' video on September 29, 2018.  *See* ECF 3, ¶¶ 19-22, 24; ECF 13-2; ECF 13-3; ECF 13-

5.  To be sure, plaintiff also alleges that Sheriff Jenkins "disapproved of women taking leave time," and that she was questioned about her use of leave by a superior or colleague in early 2017.  ECF 3, ¶ 17.  But, such allegations do not shore up the causal nexus between the investigation and the fall 2018 leave, especially given that most of plaintiff's factual allegations link the investigation to the events of September 29, 2018.

Therefore, I shall grant the FCSO Motion as to Count IV.

### 6.  Count V (Retaliation)

Count V lodges an FMLA retaliation claim against Sheriff Jenkins, Capt. Hibbard, and Lt. Null arising out of leave that Sgt. Ensor took in March 2020.  ECF 3 at 25; *see id.* ¶¶ 85-88.  The Amended Complaint does not name Lt. Warner as a defendant in this count.  *Id.*

As described in the Background, plaintiff alleges that she received approval to take FMLA leave in March 2020.  *Id.* ¶ 85.  But, her request to be placed on "restricted duty" after her return from leave was denied.  *Id.*  Consequently, plaintiff "was forced to use her sick leave to cover time off when she was capable of working a restricted duty assignment."  *Id.*  Around the same time, a male officer, Sgt. Trevor Hajjar, was "allowed to work a restricted duty assignment" after undergoing surgery.  *Id.*

According to the FCSO Defendants, these allegations fail to state a claim for retaliation under the FMLA.  ECF 13-1 at 30.  They assert: "There is no suggestion that a restricted duty assignment was available to a sergeant in Judicial Services; that Sgt. Ensor's doctor cleared her for restricted duty in time for such an assignment; or that the male colleague was similarly situated to her in any relevant way, among other details."  *Id.*  In response, plaintiff offers a single sentence: "The denial of a restricted duty assignment to Sgt. Ensor as alleged in Count V is a continuation

of the retaliation which never stopped."  ECF 19 at 24.  But, I cannot agree with the FCSO Defendants that plaintiff has, in essence, failed to oppose their contention.

Plaintiff alleges that she exercised her FMLA rights and, as a result, she was "forced to use her sick leave to cover time off when she was capable of working a restricted duty assignment." ECF 3, ¶ 85.  The implication of the allegations set forth under Count V is that Sgt. Ensor's use of sick leave under the circumstances qualifies as an adverse action.  Neither side has briefed this issue, however.  And, the Court is not aware of any authority directly on point.  But, case law suggests that an action by an employer that effectively results in an employee using paid sick leave in conjunction with FMLA leave is not the kind of adverse action that may sustain a retaliation claim.  *Cf. Freelain v. Vill. of Oak Park*, 888 F.3d 895, 902 (7th Cir. 2018) (concluding that employer's deduction of leave time from employee's "bank of sick days" did not amount to adverse action for purposes of employee's FMLA retaliation claim); *Keyhani v. Trustees of Univ. of Pennsylvania*, No. CV 17-3092, 2019 WL 2568279, at *6 (E.D. Pa. June 21, 2019) ("Moreover, requiring Plaintiff to exhaust her paid time off and sick leave before allowing her to use unpaid FMLA leave is contemplated under the regulations and is considered a reasonable accommodation under the law."), *aff'd*, 812 F. App'x 88 (3d Cir. 2020).

Therefore, I shall dismiss Count V, without prejudice, and with leave to amend.

## IV.  The County Motion

As discussed, Title VII prohibits discrimination by an employer.  *See* 42 U.S.C. § 2000e–2.  Only an employer—not individual supervisors—may be liable under the statute.  *See Lissau*, 159 F.3d at 181.  Similarly, the FMLA prohibits an employer from interfering with an employee's exercise of her FMLA rights or retaliating against an employee for exercising such rights.  *See Fry*, 964 F.3d at 244.

78

Frederick County contends that it is not a proper defendant to this suit because it is not plaintiff's employer, nor is it a joint employer. ECF 5-1 at 24. The County maintains that it "has no respondeat superior liability" for the actions of Sheriff Jenkins and others within the FCSO. *Id.* at 19. Plaintiff disputes these contentions. *See* ECF 18 at 5, 8.

At this juncture, only Count I, which asserts a Title VII claim, has survived the FCSO Motion. Therefore, I shall review the contentions as they pertain to that claim.

Notably, an entity need not be a plaintiff's sole employer in order to be liable under Title VII. Rather, under the joint employer doctrine, it may be a "joint employer" if it exercises sufficient control over the terms and conditions of the plaintiff's employment. *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 408 (4th Cir. 2015); *see Dreher v. Maryland*, GLR-17-3832, 2019 WL 528192 at \*3-4 (D. Md. Feb. 11, 2019); *Evans v. Maryland State Highway Admin.*, JKB-18-935, 2018 WL 4733159, at \*5 (D. Md. Oct. 2, 2018); *Wallace v. Bd. of Educ. of Calvert Cty.*, PX-16-3242, 2017 WL 2361161, at \*2 (D. Md. May 31, 2017). And, the implementing regulations of the FMLA expressly provide for the possibility of joint employment under the statute. *See Quintana v. City of Alexandria*, 692 F. App'x 122, 125 (4th Cir. 2017) (quoting 29 C.F.R. § 825.106(a)); *Griffin v. Sirva Inc.*, 835 F.3d 283, 293 (2d Cir. 2016) (same).

Under *Butler*, 793 F.3d at 414, courts consider nine factors to determine whether an entity is a joint employer:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;
(8) whether the individual is assigned solely to the putative employer; and
(9) whether the individual and putative employer intended to enter into an employment relationship.

The Fourth Circuit noted in *Butler* that these factors are "not dispositive" and that control remains the "'principal guidepost' in the analysis." *Id.* at 414 (quoting *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003)). Further, it stated that the first three factors, which are all related to control, are the most important. *Id.* at 414-15.

In my view, the joint employment doctrine is the proper framework for determining whether the County may be subject to joint liability under Count I. The various legal authorities cited in the submissions regarding respondeat superior liability and the relationship between a sheriff and a county under State law may be pertinent to the joint employment analysis. But, the question whether the County qualifies as plaintiff's *employer* under Title VII ultimately hinges on the joint employment test articulated in *Butler*, 793 F.3d at 414.

Before addressing the question of control at the heart of the first three *Butler* factors, I shall clear away some of the underbrush. As noted, for purposes of civil liability Maryland courts ordinarily treat sheriffs as state officials. *See, e.g. Barbre*, 402 Md. at 173, 935 A.2d at 709; *but see, e.g.*, *Rucker*, 316 Md. at 289, 558 A.2d at 406 (noting that "for some purposes and in some contexts, a sheriff may . . . be treated as a local government employee," such as for issues involving "local funding of sheriff's offices" or a sheriff's entitlement to local government employee benefits.) And, when addressing issues of sovereign immunity, judges in this district have repeatedly found that Maryland sheriffs are State, not county, actors. *See, e.g.*, *Ledergerber*, 2020 WL 7029868, at *4; *Santos*, 346 F. Supp. 3d at 799.

Before arriving at the joint employment analysis, plaintiff discusses two cases—*Dotson*, 937 F.2d 920 and *Penhollow,* 116 Md. App. 265, 695 A.2d 1268—which she says weigh in favor of the County's liability here.  *See* ECF 18 at 5-7.  I reject her contentions.

*Dotson* concerned the status of the Sheriff of Dorchester County for purposes of determining the county's liability under 42 U.S.C. § 1983, rather than Title VII.  The law regarding municipal liability under § 1983 is extensive and need not be described here at length.  But, put simply, local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *see also Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018); *Connick v. Thompson*, 563 U.S. 51, 60 (2011).  It "is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'"  *Lozman*, 138 S. Ct. at 1951 (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).  Thus, the focus on local policy under the *Monell* inquiry is distinct from the emphasis on control in the joint employment analysis under *Butler*, 793 F.3d at 414.

Moreover, the facts of *Dotson* have little in common with this case.  In *Dotson*, 937 F.2d at 921, inmates at the county jail, which was operated by the Dorchester County Sheriff, brought a § 1983 action regarding the conditions of confinement.  The suit was resolved by a settlement agreement that, among other provisions, allocated the legal fees and costs incurred by the inmates between the county commissioners of Dorchester County and the county's sheriff.  *Id.* at 922.  After the sheriff failed to pay his share of the judgment, the inmates sought to garnish the county's

bank account to satisfy the sheriff's portion of the judgment. *Id.* The district court ruled that the county was liable for the sheriff's portion, as well as its own, because the sheriff was "'a policymaker for the county when operating the Dorchester County Jail.'" *Id.* (citation omitted).

On appeal, the Fourth Circuit reasoned that, under the Supreme Court's decision in *Monell*, "County liability for the Sheriff's operation of the County Jail depends on whether the Sheriff had final policymaking authority for the County over the County Jail." *Dotson*, 937 F.2d at 924. Recognizing that the question of who has "final policymaking authority" is a question of state law, the *Dotson* Court then embarked on a lengthy survey of Maryland case law regarding county sheriffs and the operation of county jails. *See Dotson*, 937 F.2d at 925-32. Ultimately, the Court concluded, in essence, that the Dorchester County Jail was a "county institution," *id.* at 928, and that the Sheriff exercised policymaking authority for the county as to the county jail, giving rise to the county's § 1983 liability. *See id.*

Here, plaintiff has not asserted a § 1983 claim. Thus, the legal analysis in *Dotson* is inapposite.[17] Moreover, the *Dotson* decision turned specifically on the status of the county jail and the function of the Sheriff in overseeing it, neither of which are relevant to Sgt. Ensor's suit.

*Penhollow*, 116 Md. App. at 271, 695 A.2d at 1271, concerned the viability of a Title VII claim brought by a correctional officer of the Cecil County Detention Center against the Board of County Commissioners for Cecil County, among others. In particular, the Maryland Court of Special Appeals addressed whether the plaintiff could sue the county despite failing to name it in her EEOC charge. *Id.* at 283, 695 A.2d at 1278. The court concluded that including the county in

---

[17] Plaintiff also suggests that subjecting Frederick County to liability would "promote[] accountability to the electorate." ECF 18 at 14. Again, her reliance on case law concerning § 1983 is misplaced. The relevant inquiry here is not on county policy, but rather, on county control.

the suit was appropriate because *the evidence* established close links between the county and the

Sheriff's office.  *Id.* at 285, 695 A.2d at 1279.  In so ruling, the court relied on the specific facts of

the case.  Here, the question as to the county's liability similarly turns on the facts.[18]

I turn to the issue of control and to the *Butler* factors.

According to the County, each of the first three factors, which were identified as the most

important factors by the *Butler* Court, weigh in its favor.  ECF 5-1 at 27-28.  As noted, the first

factor concerns authority to hire and fire, and the second factor concerns day-to-day supervision,

including employee discipline.  The County contends that the Frederick County Sheriff has

"exclusive authority" to conduct internal investigations and to take disciplinary action against

employees of the FCSO.  *Id.* at 21; *see id.* at 20; ECF 20 at 13-14.  Although the County does not

explicitly incorporate this contention into the *Butler* analysis, it appears directed to the first and

second *Butler* factors.

In particular, the County asserts that the treatment about which Sgt. Ensor complains—the

investigation and resulting discipline—were "strictly governed by the LEOBR."  ECF 5-1 at 20.

Plaintiff does not seem to dispute this assertion.  But, it is plainly a distortion, or at best a

mischaracterization, of the facts.

---

[18] In seeking to rely on cases concerning sheriffs in counties other than Frederick County, plaintiff overlooks a complicating factor.  As I noted in *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 727, n.27 (D. Md. 2013):

> A complication in the analysis of potential employer liability of a Maryland county for a deputy sheriff's employment discrimination claims is that the statutory provisions delineating the relationship between a county and its sheriff with respect to personnel matters are not uniform.  Indeed, they vary dramatically.  *See generally* Md. Code (2013 Repl. Vol.) § 2-309 of the Courts & Judicial Proceedings Article ("C.J.") (delineating relationship between counties and sheriffs on a county-by-county basis).  Thus, it is conceivable that different results might obtain in different counties, depending on the degree of control over the employment relationship allocated to and actually exercised by each county.

The LEOBR is a State statute that "provides procedural protections for law enforcement officers under internal investigation." *Manger v. Fraternal Ord. of Police, Montgomery Cty. Lodge 35, Inc.*, 227 Md. App. 141, 144, 132 A.3d 895, 897 (2016).  It is codified at Md. Code (2018 Repl. Vol., 2020 Supp.), §§ 3–101 *et seq.* of the Public Safety Article ("P.S.").  The "primary purpose of the LEOBR is 'to guarantee certain procedural safeguards to law enforcement officers during any investigation or interrogation that could lead to disciplinary action, demotion, or dismissal.'"  *Maryland-Nat. Cap. Park And Plan. Comm'n v. Anderson*, 164 Md. App. 540, 572, 884 A.2d 157, 175–76 (2005) (cleaned up) (quoting *Coleman v. Anne Arundel Cty. Police Dep't*, 369 Md. 108, 122, 797 A.2d 770, 779 (2002)).

Here, plaintiff was informed of her right to a hearing under the LEOBR, P.S. § 3-107(a), through the Notification of Charges.  *See* ECF 13-5 at 2-3.  She waived that right when she admitted to the charges.  ECF 13-6.[19]  Moreover, the charges themselves were not drawn from the LEOBR.  Rather, the charges as well as the investigation arose out of internal FCSO policies, as indicated by the exhibits submitted by the County and the FCSO Defendants.  *See* ECF 13-5 at 2 (Notification of Charges); ECF 5-2 (FCSO Disciplinary Procedures); ECF 5-3 (FCSO General Order 52.2, "Office Of Policy And Compliance Complaint Processing").

None of the legal authorities cited by the County in its discussion of the LEOBR supports the contention that the LEOBR directly governed the investigation and other actions taken against plaintiff.  *See* ECF 5-1 at 20-21 (citing, *inter alia*, *Bray v. Aberdeen Police Dep't*, 190 Md. App. 414, 424, 988 A.2d 1106 (2010); *Boyle v. Maryland–National Capital Park & Planning Comm'n*, 385 Md. 142, 155, 867 A.2d 1050, 1058 (2005)).  The County quotes *Manger*, 227 Md. App. at

---

[19] Because Sgt. Ensor waived her right to a hearing under the LEOBR, the provisions of the LEOBR cited by the County that pertain to the imposition of penalties after a hearing are inapposite.  *See* ECF 5-1 at 20 (citing P.S. § 3-108(d)).

152, 132 A.3d at 902, for the proposition that the LEOBR leaves law enforcement agencies "reasonable discretion" regarding investigating and remedying "internal misconduct." ECF 5 at 21. Although that proposition is correct, it does not actually support the County's argument. In making that remark, the Maryland Court of Special Appeals observed that the LEOBR merely creates procedural rights for individual officers; it does not legislate the substantive rules governing law enforcement agencies' treatment of internal affairs. *Manger*, 227 Md. App. at 152, 132 A.3d 895, 902. In sum, the County's contentions concerning the LEOBR do not equate to a lack of control over plaintiff's employment.

But, for the County to liable as a joint employer, there must be some affirmative indication of the County's control over the terms and conditions of plaintiff's employment. Sgt. Ensor alleges ECF 3, ¶ 7:

> Defendant, Frederick County, Maryland is a political subdivision of the State of Maryland and is the corporate name designated by the Frederick County Charter in all actions and proceedings touching the County's rights, powers, properties, liabilities and duties. Frederick County has a County Charter form of government, consisting of a five-member County Council and a County Executive. The Frederick County Council has the power to influence and control the actions of the FCSO by appropriating funds for training deputies to carry out lawful police practices. Frederick County operates the courthouse building where Sgt. Ensor works and provides the equipment for Sgt. Ensor's office. The Frederick County Human Resources Department handles personnel administration for the FCSO, including responsibility over employment records and all payroll functions for Sgt. Ensor and FCSO employees. At all times relevant to this Complaint, FCSO employed more than 50 employees.

Thus, the Amended Complaint alleges that the County's provision of funding to the FCSO provides the County with a source of leverage over the FCSO, and a mechanism with which to "influence or control" it. *Id.* As noted, control is the "'principal guidepost'" in the joint employment analysis. *Butler*, 793 F.3d at 414 (citation omitted). In addition, plaintiff's allegations implicate the third factor (furnishing of equipment and the place of work) and the fourth factor (possession of responsibility over payroll records, among others).

85

As to funding, the County concedes: "Sheriffs' offices throughout the State of Maryland receive funding from the counties for salaries of sheriffs' deputies." ECF 20 at 14 (citing *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 726 (D. Md. 2013)). *Murphy-Taylor*, 968 F. Supp. at 726 observed: "Maryland law 'generally provides that the salaries, office expenses and traveling expenses, including automobiles, of the sheriffs' offices shall be paid by the counties.'" (Quoting *Aluisi*, 354 Md. at 434, 731 A.2d at 895).

Nevertheless, the County insists that although it pays the salaries of FCSO deputies, it does not have control over their employment because it lacks discretion to *stop* payment of their salaries. ECF 20 at 15. The only citation provided is *Murphy-Taylor*, 968 F. Supp. 2d at 726, which does not support the County's assertion. And, at the motion to dismiss stage, the facts alleged in ¶ 7 of the Amended Complaint must be taken as true.

Moreover, Md. Code (2020 Repl. Vol.), § 2-313 of the Courts and Judicial Proceedings Article ("C.J.") suggests that the third factor weighs in favor of joint employment. It provides, in relevant part:

(c) *Office and expenses.* — The government of each county shall:

    (1) Furnish an office for the sheriff;

    (2) Pay the necessary expenses for telephones, stationery, and other purposes; and,

    (3) Unless otherwise provided by law, provide for:

        . . .

        (ii) Other necessary traveling expenses.

Thus, the statute indicates that, as a matter of law, Maryland counties are responsible for the provision of workplace furnishings and equipment in sheriffs' offices. This, too, tilts the third *Butler* factor toward a finding of joint employment.

Sgt. Ensor also cites C.J. § 2-324(e)(2).  ECF 18 at 12. It provides: "All deputy sheriffs, except the chief deputy, are subject to the county personnel regulations with regard to qualifications for hiring, promotion and compensation with regard to matters not covered by the Law Enforcement Officers' Bill of Rights."  C.J. § 2-3249(e)(2).  Plaintiff has submitted an excerpt of the Frederick County Personnel Rules ("Personnel Rules").  ECF 18-5.  Section 9 of Chapter I of the Personnel Rules states, in relevant part, *id.* at 5:

> All employees appointed by the Frederick County Sheriff are subject to these rules except as follows: a) these employees are not subject to Chapter III; Chapter IV, Section 3; Chapter VIII, Section 4; and Chapter X, Section 3; b) to the extent the Law Enforcement Officers Bill of Rights (LEOBR) applies, LEOBR shall prevail; . . . . The Frederick County Sheriff's Office policies and procedures shall constitute the County Personnel regulations for those matters covered in subsection a (above). In all other respects these Personnel Rules shall apply to the employees appointed by the Sheriff.

ECF 18-5 does not contain the complete Personnel Rules.  But, the complete version is publicly available.  *See Human Resources*, Frederick County Government, https://frederickcountymd.gov/18/Human-Resources (last visited Mar. 11, 2021).  Therefore, I may consider it.  *See* Fed. R. Evid. 201.

Chapter III of the Personnel Rules is titled "Compensation Plan."  Chapter IV is titled "Types Of Employees And Applicable Benefits."  Personnel Rules at 7.  Section 3 of Chapter IV classifies newly appointed, promoted, demoted, reinstated, or transferred employees as "probationary," and sets forth various rules pertaining to probationary employees.  *Id.* at 8. Chapter VIII, Section 4 addresses "Inter-Division Transfers."  *Id.* at 13.  And, Chapter X, Section 3 lists "regular holidays for eligible regular employees."  *Id.* at 16.  Sgt. Ensor is not subject to any of these provisions, per Chapter I, Section 9.

But, the Personnel Rules do not explicitly exempt FCSO deputies from the provisions of, for example, Chapter V, titled "Employee Performance Evaluations/Pay for Performance," or

Chapter VI, titled "Disciplinary Action."  Neither side has addressed the Personnel Rules in detail, let alone whether particular provisions pertaining to hiring, firing, or disciplinary measures apply to FCSO deputies.  But, at this stage, my task is not to find facts.  Plaintiff has shown that, to some extent, she is subject to portions of the Personnel Rules.  That is relevant, broadly, to the assessment of the County's control over her employment.

Another arrow in Sgt. Ensor's quiver comes in ¶ 27 of the Amended Complaint.  Plaintiff alleges, *id.*:

> To make the transfer [of plaintiff from Patrol Operations to Judicial Services] permanent, the Sheriff requested the County Executive's approval for a concocted emergency reclassification of the sworn Court Security Corporal's position to a sworn Court Security Sergeant's position. He represented in his March 5, 2019 letter to County Executive, Jan Gardner, a copy of which is attached as Exhibit 2 that "changes in the law have necessitated an increased number of sworn personnel in Court Security."

*See also* ECF 1-2.  In her opposition, plaintiff asserts that the County had "the power to deny [Jenkins's] request if it deemed it inappropriate."  ECF 18 at 11.  That seems a reasonable inference from the allegation.  The Sheriff would not have requested the approval of the County Executive if none was required.  Thus, the Amended Complaint permits the inference that the County had some supervisory involvement in the transfer of plaintiff to Judicial services, which is relevant to the fundamental question of control over the terms and conditions of employment.

Accordingly, I will deny the County's request for dismissal of plaintiff's Title VII claim against it on the basis that it was not Sgt. Ensor's "employer."  This ruling is without prejudice to the County's right to renew this argument in a motion for summary judgment filed after discovery.

## V.  Conclusion

For the reasons stated above, I shall deny the County Motion (ECF 5).  And, I shall grant in part and deny in part the FCSO Motion (ECF 13).

As to Count I, lodged against Sheriff Jenkins in his official capacity, I shall deny the FCSO Motion, to the extent that it consists of allegations regarding the internal investigation of and discipline received by plaintiff.  Insofar as Count I concerns the treatment of plaintiff by Null in Judicial Services, I shall grant the FCSO Motion, without prejudice, and with leave to amend.

I shall grant the FCSO Motion as to Count II, Count III, and Count IV.

And, I shall grant the FCSO Motion as to Count V, lodged against Sheriff Jenkins, Capt. Hibbard, and Lt. Null in their individual capacities, without prejudice, and with leave to amend.

Plaintiff may file a second amended complaint to cure the deficiencies in Count I and Count V, addressed, *supra*, by April 23, 2021.  If plaintiff fails to do so, then the dismissal of the pertinent portion of Count I and of Count V shall be with prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   March 25, 2021                                    _____/s/_____
                                                         Ellen L. Hollander
                                                         United States District Judge