IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SGT. AMANDA J. ENSOR
    *Plaintiff*,

  v.

SHERIFF CHARLES A. JENKINS, *et al.*
    *Defendants*.

Civil Action No. ELH-20-1266

**MEMORANDUM OPINION**

This Memorandum Opinion concerns an employment discrimination suit brought by plaintiff Amanda Ensor, a Sergeant ("Sgt.") in the Frederick County Sheriff's Office ("FCSO" or "Sheriff's Office"). The Second Amended Complaint (ECF 28) is the operative pleading. There, plaintiff names as defendants Frederick County (the "County"), as well as three FCSO officials, in their individual and official capacities: Sheriff Charles Jenkins; Lieutenant ("Lt.") Jason Null;[1] and Captain ("Capt.") Ronald Hibbard.[2] Plaintiff appended three exhibits to the Second Amended Complaint ("SAC"). *See* ECF 26-2; ECF 26-3; ECF 26-4.[3]

---

[1] Null is now a Captain with the FCSO. But, during the relevant period, he held the rank of Lieutenant. See ECF 28, ¶ 5. For the sake of consistency, I shall refer to him as Lt. Null.

[2] Plaintiff previously sued the FCSO and another FCSO official, Lt. Gregory Warner. ECF 1. As discussed in my Memorandum Opinion of March 25, 2021 (ECF 22 at 28-29), plaintiff agreed that the FCSO was not a proper defendant, and I dismissed FCSO from the suit. ECF 23 (Order of March 25, 2021).

In addition, I dismissed plaintiff's claims as to Lt. Warner. *See* ECF 22 at 36, 48, 72, 77; ECF 23 at 1. Plaintiff does not include Lt. Warner in the caption of the SAC. But, she does identify him as a party. *See* ECF 28, ¶ 6.

[3] Plaintiff did not resubmit these exhibits with the corrected version of the SAC. Nevertheless, it is plain that the SAC relies on them. *See* ECF 28, ¶¶ 25, 27, 40.

The dispute is rooted in Sgt. Ensor's participation in a video that was published on YouTube. Plaintiff characterizes the video as a prank and claims it was intended "to foster community goodwill." ECF 28, ⁋ 19. As a result of Sgt. Ensor's participation in the video, the FCSO investigated, penalized, and subsequently reassigned plaintiff to the "Judicial Services" division of the FCSO. In plaintiff's view, the reassignment amounts to a demotion. And, plaintiff claims that she has been subjected to discriminatory and retaliatory treatment.

The Amended Complaint (ECF 3) contained five counts: disparate treatment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") (Count I), and in violation of the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2021 Repl. Vol.), §§ 20-601 *et seq.* of the State Government Article (Count II). ECF 3 at 17, 19. The remaining counts alleged violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* In Count III, plaintiff alleged "Unlawful Interference and Denial of FMLA Benefits Due to Transfer/Demotion in Violation of 29 U.S.C. § 2615(a)(1)." *Id.* at 21. In both Count IV and Count V, plaintiff asserted "Discrimination/Retaliation for taking FMLA Leave in Violation of 29 U.S.C. § 2615(a)(2)." *Id.* at 23, 25. Count IV concerned leave taken by plaintiff in October 2018. *Id.* ⁋ 74. And, Count V concerned medical leave taken by plaintiff in March 2020. *Id.* ⁋⁋ 84, 85. Count I, Count II, and Count IV were brought against all defendants. *Id.* at 17, 19, 23. Count III named all defendants except Lt. Null. *Id* at 23. Count V named all defendants except Lt. Warner. *Id.* at 25.

The County moved to dismiss plaintiff's Amended Complaint or, in the alternative, for summary judgment. ECF 5. And, the FCSO, as well as the FCSO officials, moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF 13 ("Rule 12 Motion"). By Memorandum Opinion (ECF 22) and Order (ECF 23) of March 25, 2021, I denied

the County's motion, and I granted the Rule 12 Motion in part and denied it in part. Relevant here, I granted the motion as to plaintiff's claims against the FCSO and dismissed the FCSO from the suit. ECF 23. Further, I granted the Rule 12 Motion with respect to Counts II, III, and IV, and dismissed those claims. *Id.*[4]

With respect to Count I, however, I denied the Rule 12 Motion to the extent that it was lodged against Sheriff Jenkins in his official capacity and to the extent that it "consists of allegations regarding the internal investigation of and discipline received by plaintiff." *Id.* But, insofar as Count I concerned "the treatment of plaintiff by Null with respect to Judicial Services," I granted the Rule 12 Motion, without prejudice and with leave to amend. *Id.* And, I dismissed Count V, also without prejudice and with leave to amend.

Plaintiff timely filed the SAC, which includes new allegations with respect to Lt. Null's treatment of plaintiff while she was working in Judicial Services, as well as additional details concerning Lt. Null's purported denial of a restricted duty assignment for plaintiff following her surgery in March 2020.

The SAC contains the same five counts previously asserted in the Amended Complaint. However, the SAC acknowledges that Count II was "Dismissed per Court Order ECF 23." ECF 28 at 22. The SAC also indicates that the Court dismissed Count III and Count IV, "except to the extent the claims seek equitable relief in the form of reinstatement." *Id.* at 24, 27 (emphasis omitted).

---

[4] In the Memorandum Opinion of March 25, 2021, the Court determined that the individual defendants could not invoke sovereign immunity as a defense to plaintiff's claims in Counts III and IV, to the extent that plaintiff sought reinstatement. ECF 22 at 62-63. But, the Court subsequently found that both Count III and Count IV failed to state a claim for violation of the FMLA. *Id.* at 72, 77. Accordingly, in the accompanying Order, the Court granted the FCSO Motion as to these counts, with prejudice. ECF 23 at 1.

To the extent that the claims were previously addressed in ECF 22 and ECF 23, I incorporate here my earlier discussion.  Because the Court previously dismissed three of the five claims, without leave to amend, I shall address here only the counts that were amended in the Second Amended Complaint.

In particular, Count I asserts a claim against the County as well as the individual defendants for disparate treatment on the basis of sex, in violation of Title VII.  ECF 28 at 20-22.  Of import here, the SAC amended Count I so as to include a claim for the denial of plaintiff's request for a restricted duty assignment after her surgery in March 2020.  *Id.* ¶ 50.  And, as to the denial of the request for restricted duty, Count V lodges a claim against the County, Sheriff Jenkins, Capt. Hibbard, and Lt. Null for "Discrimination/Retaliation," in violation of the FMLA.  *Id.* at 29-31.

Sheriff Jenkins, Capt. Hibbard, and Lt. Null (the "Movants") have filed a partial motion to dismiss the SAC; they seek dismissal of the portion of Count I that pertains to the denial of plaintiff's request for a restricted duty assignment after her surgery in March 2020, as well as Count V.  ECF 31.  The motion is accompanied by a memorandum of law (ECF 31-1) (collectively, the "Motion"), as well as two exhibits.  *See* ECF 31-2; ECF 31-3.[5]

As mentioned, I previously denied the motion to dismiss Count I, lodged against Sheriff Jenkins in his official capacity, to the extent it is based on allegations regarding the investigation of plaintiff and the resulting discipline.  ECF 22 at 58.  Sheriff Jenkins does not renew that challenge.  Nor does he challenge the portion of Count I pertaining to conditions of employment in the Judicial Services Section.  ECF 31-1 at 7.  Rather, the Motion urges the Court to dismiss

---

[5] The Motion also references a charge for discrimination (the "Charge") that plaintiff filed with the Equal Employment Opportunity Commission ("EEOC").  ECF 31-1 at 8.  The Charge was previously filed in connection with the Rule 12 Motion.  *See* ECF 13-7.  However, the Movants did not resubmit the Charge with the Motion.

Count I only with respect to the claim based on the denial of a restricted duty assignment following plaintiff's surgery in March 2020.  *See* ECF 31-1 at 7-9.  And, as noted, the surgery is the basis of Count V.

Plaintiff opposes the Motion.  ECF 35 (the "Opposition").  The Opposition is supported by two exhibits.  See ECF 35-1; ECF 35-2.  And, the Movants have replied.  ECF 36.[6]

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I.    Factual and Procedural Background

As mentioned, the Motion implicates the portion of the SAC that concerns the denial of a restricted duty assignment that plaintiff sought in March 2020.  Thus, many of the details alleged in the Second Amended Complaint have little bearing on the resolution of the Motion.  But, for the purposes of contextualizing the parties' dispute, I have drawn on the SAC, as well as the facts recounted in my Memorandum Opinion of March 25, 2021.  *See* ECF 22.

### A.

Sgt. Ensor began working for the Sheriff's Office as a Deputy Sheriff in October 2002. ECF 28, ¶ 15. Until January 2019, plaintiff was "the only female sergeant of Patrol Team Operations" employed by the FCSO.  *Id.* ¶ 16.  "As the Sergeant of Patrol Team 1, she was in charge of all discretionary calls.  She oversaw between 15 and 30 deputies and provided supervisory responses on calls involving overdoses, deaths, serious crashes, and any crime involving communication with the States [sic] Attorney's Office . . . ."  *Id.*

---

[6] The County has also filed a motion to dismiss the SAC.  *See* ECF 40.  However, that motion is not yet ripe for resolution.

Plaintiff was "a hard-working employee" who regularly received "accolades and 'attaboys' . . . for a job well done." ECF 28, ⁋ 15.  For over eighteen years, plaintiff often received "excellent" performance evaluations and, with the exception of one evaluation written by Lt. Null for the first quarter of 2019, plaintiff never received less than "acceptable" ratings.  *Id.*  And, even in that evaluation, "Lt. Null rated Sgt. Ensor as 'Acceptable' or 'Superior' in all but 2 of 18 categories." *Id.*  In those two categories, Lt. Null rated plaintiff as "'Needs Improvement.'"  *Id.*  But, just two months later, in June 2019, "Lt. Null rated her 'Acceptable' or 'Superior' in all categories with the comment, 'I expect that Sgt. Ensor will continue to excel in the Court Security Unit.'"  *Id.*

Sgt. Ensor alleges that since she joined the FCSO, "she has been treated differently because she is a woman." *Id.* ⁋ 35.  For instance, in 2004 plaintiff's superior told her that "he had a 'hit list' for women at work he wanted to have sex with," and asked her "if she wanted to have sex with him."  *Id.*  The question made plaintiff feel "extremely uncomfortable."  *Id.*  Thereafter, she "told a few coworkers about [the incident] . . ., but nothing came of [it]."  *Id.*  And, "[a] similar incident occurred with another supervisor a few years later."  *Id.*

Furthermore, Sgt. Ensor alleges that she experienced "discrimination based on gender when she became pregnant . . . in 2011." *Id.* ⁋ 36.  At this time, she was "working in the Narcotics section."  *Id.*  When plaintiff was six-months pregnant she was placed on "light duty in that section."  *Id.*  Her superior at the time attempted to bar plaintiff from working overtime hours, which plaintiff resisted, insisting "that she could not be denied overtime just because she was pregnant . . . ."  *Id.*  Shortly thereafter, plaintiff was transferred out to the "Criminal Investigations Division under different supervision."  *Id.* ⁋ 36.  After returning from maternity leave, plaintiff "returned to Narcotics" but was again "forced out."  *Id.*  ⁋ 37.

Sgt. Ensor characterizes the culture of the Sheriff's Office as "one of discriminatory animus toward multiple protected characteristics, including sex." *Id.* ¶ 14.  Sheriff Jenkins, who leads the FCSO, contributes to that culture, according to plaintiff.  *See id.* ¶ 14.   Sgt. Ensor alleges: "Defendant Jenkins has publicly expressed that females should not be in supervisory or command positions. He talks about women in a derogatory manner." *Id.*

Moreover, the Sheriff "disapproved of women taking leave time." *Id.* ¶ 17.  For example, in February 2017, Sgt. Ensor "had serious medical surgery," for which her doctors directed her to take six to eight weeks off from work "to recuperate." *Id.*  However, because plaintiff "feared retaliation" from the Sheriff, "she shortened her leave time to two weeks." *Id.*

According to the SAC, since 2005 plaintiff has lived in Washington County.  *See id.* ¶¶ 2, 38.  FCSO policy prohibits vehicles "from being taken out of county." *Id.* ¶ 38.  Although plaintiff was "grandfathered in under the current policy," for a period in 2011, plaintiff's superiors prohibited her from driving her FCSO vehicle to her home.  *Id.*  In plaintiff's view, this reflected "animus" toward her.  *Id.*

**B.**

In 2016, Sgt. Ensor served as the FCSO's Police Information Officer ("PIO").  ECF 28, ¶ 20.  The role entailed engaging in "community building activities" (*id.* ¶ 20), and managing the "online presence" of the Sheriff's Office.  *Id.* ¶ 22.  Plaintiff alleges, in part, *id.* ¶¶ 22-23:

> 22.    . . . . As PIO, Sgt. Ensor developed the online presence for the FCSO. She created different social media platforms for the agency and was commended by supervisors, deputies and the public on numerous occasions for her work. . . .  At no time during her assignment as the PIO was Sgt. Ensor required to run anything by the Sheriff.  He freely allowed Sgt. Ensor to post any video or information that she chose, without speaking to him first.  His position was that he trusted her judgment and never monitored what she posted.  The only time he expressed concern about posting was to ensure that she posted things for him pertaining to his political appearances.

23.     As PIO, Sgt. Ensor looked for ways to promote a positive image of FCSO. She sought to highlight the good works of the FCSO and to interact with the community in a way that engendered respect. Sometimes that was as simple as showing the community that FCSO can have fun and be cool. One of the vehicles she used to accomplish this was posting photos and short videos . . . .

The SAC does not specify when plaintiff's tenure as PIO began or ended. But, she clearly held the position in 2016. *See* ECF 28, ¶ 20.

On September 29, 2018, Sgt. Ensor "participated in" a "prank video" with two other officers and the so-called Dobre Brothers. *Id*. ¶ 19; *see* ECF 22 at 6 (citing ECF 13-5 at 4). The Dobre Brothers are described as "famous YouTubers who live in Frederick County. They travel the world singing songs about anti-bullying and have a large following on YouTube." ECF 28, ¶ 19. They had previously been contacted by the FCSO and invited to participate in a "viral lip sync challenge that was going on for many law enforcement agencies," although ultimately the "challenge did not come to fruition." *Id.* ¶ 23.

As to plaintiff's participation in the "prank" video, she alleges, *id.* ¶ 19:

[The Dobre Brothers] asked if the Sheriff's office would "prank" their brother, Marcus, by arresting him at their residence. Marcus was in on the prank. Sgt. Ensor did not record the video or post it on any social media sites. She participated in the staged prank to promote a positive relationship with the Dobre brothers in the community and to show that the police can interact with the public and have fun.

In light of Sgt. Ensor's prior experience as PIO, she was "comfortable with the [Dobre Brothers'] request." *Id.* ¶ 20. And, she ensured that, at the end of the video, the Dobre Brothers disclosed that the apparent arrest was staged and acknowledged the participation of "the Sheriff's office." *Id.* ¶ 21. Plaintiff does not describe the contents of the video, but it is publicly available on YouTube. And, as of March 1, 2022, the video has received more than 9.7 million views. *See*

Lucas and Marcus, POLICE PRANK ON TWIN BROTHER!, YOUTUBE (Sept. 30, 2018), https://youtu.be/7zIR375d0ww.[7]

Plaintiff did not "take any gratuities or receive any compensation" for her participation in the video.  ECF 28, ⁋ 21.  While the video was being recorded, plaintiff "continued to monitor radio transmissions . . .  in the event she was needed at another call for service or requested by a deputy."  *Id*.  Moreover, she claims she never sought "to hide the fact that she was interacting with the Dobre Brothers."  *Id*.  And, according to the SAC, "Defendants have allowed the video to remain on YouTube . . . ." *Id*. ⁋ 20.

Soon after, on October 1, 2018, plaintiff underwent "major surgery" to her shoulder and arm because of a "torn labrum."  *Id*. ⁋ 18.  She began a period of "FMLA leave" through December 15, 2018.  *Id*.  She returned to work on December 17, 2018.  *Id*. ⁋ 27.  That date fell on a Monday.  *See* Fed. R. Evid. 201 (permitting a court to take judicial notice of "adjudicative facts").

During plaintiff's absence, the FCSO began an "internal investigation" into her involvement in the video.  ECF 28, ⁋⁋ 18, 19.  The SAC refers to the internal investigation as an "IA." *See id.* ⁋⁋ 18, 24(a).  The investigation was conducted by the Office of Policy and Compliance within the FCSO, which is led by Lt. Warner.  *See id*. ⁋⁋ 6, 26.

On November 15, 2018, while plaintiff was on FMLA leave, "Lt. Warner came to Sgt Ensor's home, during a snowstorm, to serve her with the IA complaint."  *Id*. ⁋ 25; *see id.* ⁋ 18.  And, plaintiff "was ordered by Lt. Warner to come to the Sheriff's Office, while she was still recuperating, to submit to an interrogation . . . .  Lt. Warner and Sheriff Jenkins insisted that she report for the interrogation."  *Id*. ⁋ 18.

---

[7] The Court may take judicial notice of the video's publication on YouTube.  *See* Fed. R. Civ. P. 201.

On the same date, Sgt. Ensor's counsel at the time, Patrick McAndrew, sent Lt. Warner a letter regarding plaintiff's rights as a subject of an internal investigation. *See* ECF 26-2. The letter, which was sent both by email and U.S. mail, stated that serving plaintiff "with documents relating to a pending internal investigation" while plaintiff was "out on FMLA leave" violates the Law Enforcement Officer Bill of Rights ("LEOBR"), Md. Code (2018 Repl. Vol., 2021 Supp.), §§ 3-101 *et seq.* of the Public Safety Article, and the FMLA. ECF 26-2 at 1; *see* ECF 28, ⁋ 25. The letter also asserted that conducting an "interrogation" as part of the investigation during plaintiff's leave was impermissible under the LEOBR as well as FCSO "General Order 52.3, Internal Affairs Procedures." *See* ECF 26-2 at 1. And, McAndrew stated that Sgt. Ensor "is presently not prepared to defend herself in an internal investigation while recovering from a major surgery." *Id.* at 2. But, McAndrew indicated that plaintiff would agree to participate in an interrogation upon her return to work. *See id.* at 1-2.

The SAC alleges, ECF 28, ⁋ 25: "The FCSO has one year to serve an officer with an IA complaint. They knew Sgt. Ensor was out on FMLA leave for surgery. They knew it was highly unusual to begin an investigation when an officer is out on protected leave." Nevertheless, Sgt. Ensor participated in an interrogation while on FMLA leave. *See id.*, ⁋⁋ 6, 19, 24, 47. The Second Amended Complaint does not specify the date of the interrogation.

Plaintiff returned from leave on December 17, 2018. *Id.* ⁋ 27. She "was 'temporarily' transferred out of Patrol Operations to Judicial Services at the [Frederick County] Courthouse." *Id.*; *see id.* ⁋ 16. However, the transfer was not actually temporary; Sgt. Ensor has been assigned to Judicial Services at the Frederick County Courthouse ever since she returned from FMLA leave on December 17, 2018. *Id.* ⁋ 27. And, she was asked to "create her own job description for her role as Court Security Sergeant in Judicial Services." *Id.* ⁋ 28.

Plaintiff asserts that Lt. Warner's investigation was supposed to be "independent." ECF 28, ⁋ 26. But, plaintiff alleges, *id.*:

> The IA investigation against Sgt. Ensor was not independent because Command staff was allowed to alter the charges and findings reached by the Office of Compliance. The Office of Compliance investigated the allegations but then sent its findings back down to Captain Hibbard and permitted him to add charges and findings after the fact. Initially, Lt. Warner's sole finding of wrongdoing was that Sgt. Ensor did not obtain permission from the Sheriff, the result of which would be a written reprimand. When Sgt. Ensor received the Notification of Charges in January 2019, she was surprised to find two additional charges, including the serious, albeit nebulous, charge of "Incompetence." Instead of the investigation proceedings going through the proper chain of command, they went from Lt. Warner in the Office of Policy and Compliance back to Captain Hibbard in December 2018. Captain Hibbard added the serious allegations and offenses before sending it through the chain of command. This is not normal procedure. In the end, it permitted exactly what it is structured to prevent, a personal attack by Defendants Hibbard and Jenkins on Sgt. Ensor.

The SAC does not include any additional details about the charges against Sgt. Ensor or the results of the investigation. Plaintiff asserts: "The IA discipline was officially issued on January 23, 2019." *Id.* ⁋ 27.

The defendants previously submitted a copy of the "Notification of Charges" issued to Sgt. Ensor on January 23, 2019. ECF 13-5 at 2. Plaintiff was charged with violations of three "Rules, Policy, and Procedures" of the Sheriff's Office: "Abuse of Position/Unauthorized Use of Likeness" (Rule 4.4); "Neglect of Duty (Inattentiveness to duty)" (Rule 26-2); and "Incompetence (Perform to the highest standard)" (Rule 34-2). *Id.* at 1-2.

According to the Notification of Charges, Rule 4-4 provides, ECF 13-5 at 1:

> An employee shall not permit or authorize the use of his/her name, photograph, or official title identifying him/her as an employee of the Frederick County Sheriff's Office in connection with testimonials or advertisements of any commodity or commercial enterprise, or for personal reasons without the written approval of the Sheriff.

Rule 26-2 states: "An employee will not read, play games, watch television or movies, or engage in any activity or personal business while on duty that would cause neglect or inattentiveness to that duty." *Id.* And, Rule 34-2 provides: "Employees shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Frederick County Sheriff's Office." *Id.*

The Notification of Charges included a "Statement of Facts." It stated, ECF 13-5 at 4:

On September 29, 2018, Sgt. Amanda Ensor was on duty and coordinated and participated in an unapproved video "stunt" involving the Dobre Brothers that was filmed by a member of their crew, and the following day, the video was posted on the Dobre Brothers YouTube channel, which has garner[e]d over 1.5 million views. The video showed the two deputies pulling over one of the Dobre Brothers, handcuffing, and subsequently interviewing the Dobre Brothers about a dog that was abandoned. Both of the Dobre Brothers ended up being handcuffed. The plot of the video was that one of the Dobre Brothers was pranking the other to make it appear that one was being arrested/investigated for abandoning a dog. The deputies involved were Deputy Blackmire and Deputy Jewell, both subordinates of Sgt Ensor. Sgt. Ensor was observed on video at the end of the video. The video was recorded at the Dobre's [sic] residence on Stewart Hill Rd. in Adamstown, MD. The video was made during the evening hours of 09/29/2018 while Sgt. Ensor, Deputy Jewell, and Deputy Blackmire were on duty, wearing their agency issued uniforms, being compensated by the County, and working their assigned shift. Sgt. Ensor orchestrated the video by contacting both Deputy Blackmire and Jewell asking them to be involved, which both of them did. It was learned through the Internal Investigation that the deputies were at the Dobre Brothers residence for about 50-55 minutes.

Sgt. Ensor was on duty, wearing official Sheriff's Office uniform and equipment, being paid by the agency, and utilizing a marked Sheriff's Office vehicle. The video that was created was not approved by the Sheriff or by any members of the Command Staff.

Plaintiff signed the Notification of Charges in two places. Her signature first appears on the page advising of a right to a hearing. ECF 13-5 at 3. It is dated January 23, 2019. *Id.* And, plaintiff signed again following the factual summary and advisement of the charges. *Id.* at 4.

- 12 -

The charges were "sustained." ECF 13-5 at 2. And, the Notification of Charges reflects a recommendation of a written reprimand as to the Rule 4-4 violation and a "[l]oss of take home vehicle [for] 30 working days" for the Rule 26-2 violation. *Id.* As to the charge of incompetence under Rule 34-2, it reflects a recommendation of a fifteen-day (120-hour) suspension without pay and plaintiff's transfer from "Patrol Operations" to "Judicial Services." *Id.* The document also advised plaintiff of her right to a hearing under LEOBR. *Id.* at 3.

According to an exhibit submitted by the FCSO Defendants, Sgt. Ensor admitted to the charges on January 28, 2019. ECF 13-6. Therefore, plaintiff waived her rights under the LEOBR, including her right "to appeal the finding and disciplinary action." *Id.*

## C.

According to plaintiff, Sheriff Jenkins sought to make plaintiff's transfer to the Courthouse "permanent." ECF 28, ⁋ 27. On March 21, 2019, plaintiff learned from Lt. Null, her commanding officer, *id.* ⁋ 5, that in order to make plaintiff's transfer permanent the FCSO had to "reclassify her position" and "to show that they needed another Sergeant's position at the Courthouse." *Id.* ⁋ 27. Plaintiff asserts, *id.*:

> [T]he Sheriff requested the County Executive's approval for a concocted emergency reclassification of the sworn Court Security Corporal's position to a sworn Court Security Sergeant's position. The County Executive had the responsibility to review the Sheriff's request and had the power to approve or deny his request. The Sheriff represented in his March 5, 2019 letter to County Executive, Jan Gardner, a copy of which is attached as Exhibit 2 that "changes in the law have necessitated an increased number of sworn personnel in Court Security."

But, according to plaintiff, the Sheriff's representation was "false," and "made solely to demote Sgt. Ensor." *Id.* She states, *id.*: "In fact, no additional sworn personnel have been added to Court Security." *Id.* Moreover, plaintiff asserts that although Sgt. Dana Hubble is "the direct supervisor of the Court Security Unit," plaintiff was told by Lt. Null that "if HR were to come over

and ask her, she would have to say that she was in charge of the unit [at the courthouse]." ECF 28, ⁋ 27. Lt. Null added that plaintiff actually "was in charge only of sworn personnel." *Id.*

The SAC identifies three male officers employed by the FCSO who were disciplined less severely, if at all, for "more egregious actions." *Id.* ⁋ 33; *see id.* ⁋ 39. However, the details concerning these comparators are not pertinent for present purposes. Therefore, I need not recount the allegations as to them.

Plaintiff alleges that she satisfactorily discharged her duties as the Court Security Sergeant throughout her tenure in Judicial Services. *Id.* ⁋ 28. In that capacity, she was responsible for handling leave requests to ensure that the Frederick County Courthouse is always appropriately staffed, confirming that prisoners have no outstanding warrants before they are released from custody, and completing timely evaluations of all "sworn members" assigned to the courthouse. *Id.* In addition, the SAC alleges that as the Court Security Sergeant, plaintiff "work[ed] the assigned post in the command center," where she was "in charge of opening and closing the garage gate, monitoring the interior and exterior cameras, and answering phone calls from courthouse employees, parole and probation employees and citizens." *Id.* Further, Sgt. Ensor claims that she was responsible for escorting victims to their vehicles after protective order hearings, supervising day-to-day activities of all employees in the Court security unit, riding with the civil process servers to assist in posting notices for late rent or evictions, and preparing the daily schedule for the unit at the close of business each day. *Id.*

Further, Sgt. Ensor contends that her "performance and direction of all these activities . . . resulted in smooth daily operations, without incident or emergency" in the courthouse. *Id.* Moreover, Sgt. Ensor never received any complaints about her work. *Id.* To the contrary, her

current commanding officer, Lt. Benner, "has given her excellent evaluations for the same caliber of work she was performing under the command of then Lt. Null."  ECF 28, ₱ 28.

According to plaintiff, since her transfer to the courthouse, Lt. Null has "harassed, discriminated, and retaliated against [her] in a multitude of ways."  *Id.* ₱ 29.  In particular, Sgt. Ensor avers that "Lt. Null held her to standards to which the male employees, including [Sgt. Ensor's] subordinates [were] not held, including, but not limited to prohibiting her from leaving the Courthouse for even a lunch break."  *Id.*

Moreover, plaintiff complains that Lt. Null required her "to go on or off duty on the radio or her computer when she reached the Frederick County line" during her commute to and from work.  *Id.* ₱ 30.  For pay purposes, however, plaintiff's day did not start until she arrived at the courthouse.  *Id.*  In contrast, the male officers were not compelled  "to go on duty on the radio or their computer when they reached the County line," but "their day DID start or end when they crossed the County line."  *Id.*  Stated differently, Lt. Null permitted "male officers . . . to use the commute as paid working time without requiring them to get on the radio," yet plaintiff was denied the opportunity to take advantage of the same policy.  *Id.*

### D.

Sgt. Ensor underwent "hernia surgery" on March 20, 2020.  *Id.* ₱₱ 40, 93.  Before the surgery, plaintiff obtained approval for "FMLA leave for the surgery and her recovery."  *Id.* ₱ 40; *see id.* ₱ 93.  Plaintiff's doctor also approved "restricted duty" during her recovery.  *Id.* ₱₱ 40, 93. According to plaintiff, the restriction did not pertain to the number of hours she could work. *Id.* ₱ 42.  Rather, it concerned the scope of her duties.  *Id.*

Plaintiff's supervisor, Lt. Benner, submitted a written request to Lt. Null on March 15, 2020, requesting that plaintiff be placed on "restricted duty" during her recovery.  *Id.* ₱ 40.  A copy

of the letter is docketed at ECF 26-3.  In the letter, Lt. Benner stated that he had "several projects Sgt. Ensor can work on while on light duty . . . ."  *Id.*  And, plaintiff maintains that she "was familiar with and qualified for this work."  ECF 28, ¶ 40.

Plaintiff notes that when restricted duty is not available in one's own unit, the Sheriff's Office "has a practice of offering people seeking a temporary, restricted duty assignment an opportunity to work in a different unit so they may continue working." *Id.* ¶ 41.  For instance, "DFC (now Sgt.) Rob Deckhut, who worked on Patrol, was temporarily assigned to restricted duty in the Narcotics unit after a skiing injury."  *Id.*  More recently, in early 2020, a male officer, Sgt. Trevor Hajjar, was "allowed to work a restricted duty assignment" after undergoing surgery.  *Id.*

Nevertheless, Lt. Null denied plaintiff's request for restricted duty.  *Id.* ¶ 42.[8]  Sgt. Ensor avers that he did so "acting at the direction of Sheriff Jenkins and/or Cpt. Hibbard. . . ." *Id.*  Plaintiff asserts that she had no available sick time, *id.*, but also that she had to use her sick leave to cover her time off.  *Id.* ¶ 93.

In any event, plaintiff alleges that she "was forced to ask her friends and coworkers to donate leave to her." *Id.* ¶ 42.[9]  Further, plaintiff contends: "[H]ad she been granted permission to work the restricted duty assignment, she would have worked her regular overtime hours and earned

---

[8] Lt. Benner's letter reflects that by March 15, 2020, Null had been promoted to Captain. *See* ECF 26-3.

[9] Plaintiff avers that she is "subject to all but certain specified Frederick County Personnel Rules."  ECF 28, ¶ 7.  And, pursuant to the Frederick County Personnel Rules, ch. X, § 9, County employees with a "temporary, non-work related illness, injury or disability" who have "exhausted all of their accrued leave" may apply to receive donated leave hours from other County employees. *See Frederick County Personnel Rules*, ch. X, § 9, https://frederickcountymd.gov/DocumentCenter/View/330906/Frederick-County-Personnel-Rules--8-1-15-Mod-2-13-21 (last visited Mar. 1, 2022).

overtime pay."  ECF 28, ¶ 42.  Thus, in Sgt. Ensor's view, "the Sheriff's denial of her request constitute[d] an adverse employment action."  *Id.*

**E.**

On March 19, 2019, Sgt. Ensor filed a formal Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC").  A copy of the Charge was previously submitted with the Rule 12 Motion.  *See* ECF 13-7.

The Charge identified the Sheriff's Office as plaintiff's employer.  *Id.* at 2.  Plaintiff checked the box for discrimination based on sex.  *Id.*  Moreover, she indicated that discrimination occurred on November 15, 2018.  *Id.*  Notably, plaintiff did not check the box for "Continuing Action."  *Id.*

The narrative portion of the Charge provides, in full, *id.*:

I.      I began my employment with the above-named Respondent in October 2002, as a Sergeant. On November 15, 2018, I was disciplined and suspended by Charles A. Jenkins (Sheriff). However, Lieutenant Jeffrey Eyler (male) who committed a similar violation was not disciplined or suspended.

II.     Respondent stated that I was disciplined and suspended for violating departments policies.

III.    I believe that I was discriminated against based on my sex (Female) with respect to discipline and suspension in violation of Title VII of the Civil Rights Act of 1964, as amended.

The EEOC mailed a "Dismissal and Notice of Rights" letter to plaintiff on February 20, 2020.  ECF 28, ¶ 12. Plaintiff's counsel received the Right to Sue Letter on February 22, 2020.  *Id.* This suit followed on May 20, 2020.  ECF 1.

Plaintiff asserts, *inter alia*, that the "machinations" of the FCSO have made her "miserable."  ECF 28, ¶ 32.  "She suffers from sleep deprivation, stress and anxiety, often waking

up in a cold sweat, fearing what treatment next awaits her." *Id.* Plaintiff was also prescribed medication for anxiety. *Id.*

## II.      Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304 (4th Cir. Jan. 21, 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 305; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not

include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A

court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan*

*Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of*

*Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As mentioned, plaintiff appended three exhibits to the SAC.  See ECF 26-2; ECF 26-3; ECF 26-4.  Sgt. Ensor expressly references each of these exhibits in the SAC, and discusses the facts contained within these exhibits.  *See* ECF 28, ¶¶ 25, 27, 40.  Therefore, they are incorporated into the SAC and they are also integral to it.  As a result, I may consider them in resolving the Motion.

In addition, the Movants submitted two exhibits with the Motion.  *See* ECF 31-2; ECF 31-3.  The first exhibit contains four documents relating to plaintiff's request for restricted duty: an

"Intra-Office Routing Slip" that Lt. Null sent to other FCSO officials, including Sheriff Jenkins (ECF 31-2 at 2) (the "Routing Slip"); a copy of Lt. Benner's approval of Sgt. Ensor's request for restricted duty (*id.* at 3) (the "Approval"); plaintiff's request for restricted duty (*id.* at 4) (the "Request"); and a copy of a note from plaintiff's doctor, approving her for restricted duty for the week preceding her surgery (*id.* at 5) (the "Note").  The second exhibit includes an "Application for Sick Leave Donor Program," which Sgt. Ensor completed on March 16, 2020 (ECF 31-3 at 2-4) (the "Application").

As I see it, the Note, the Request, and the Approval directly concern plaintiff's allegations that she submitted a request for a restricted duty assignment to FCSO officials, in accordance with her doctor's recommendation.  ECF 28, ¶ 40.  Moreover, plaintiff included the Approval as an exhibit to the SAC.  *See* ECF 26-4.  Because these exhibits are integral to the SAC, I may consider them.  Likewise, the Application directly pertains to plaintiff's allegation that her colleagues donated paid leave to her.  ECF 28, ¶¶ 42, 95.  Thus, it is also integral to plaintiff's suit, and I may consider it in resolving the Motion.   On the other hand, Sgt. Ensor did not reference the Routing Slip in the SAC, nor does it form the basis of plaintiff's claims.  Therefore, it is not integral to plaintiff's suit, and I may not consider it in resolving the Motion.

As mentioned, the Motion also references the Charge, which was submitted by the FCSO Defendants as an exhibit to their prior Rule 12 Motion. *See* ECF 13-7.  Although the Movants have not resubmitted the Charge, a court may "properly take judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990);  *see* Fed. R. Evid. 201(b)(2); *see also Schultz v. Braga*, 290 F.Supp.2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings).  Moreover, "[i]n employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."  *Campbell v. Mayorkas*, 3:20-

cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)).   Therefore, I may consider the Charge in resolving the Motion.

The Motion also asks the Court to consider a FCSO policy that outlines the circumstances in which a FCSO employee is rendered eligible to work a restricted duty assignment.  *See* ECF 31-1 at 10 n.9 (citing *Frederick County Sheriff's Office Policies, General Order 22.2.15, Restricted Duty* at 131-32, https://frederickcountymd.gov/DocumentCenter/View/324933/Policy--Procedures-2020-Update (last visited Mar. 7, 2022)) (hereinafter, "General Order 22.2.15").  The defense also points out that the  General Order 22.2.15 is a matter of public record.  ECF 31-1 at 4 n.3.

The claim in Count V does not reference General Order 22.2.15.  Rather, plaintiff claims that the FCSO has "a practice" of offering restricted duty.  ECF 28, ¶ 41.  But, plaintiff did not dispute the assertion that General Order 22.2.15 is a matter of public record.  Therefore, I may consider it.

Plaintiff also filed two exhibits in support of her Opposition.  *See* ECF 35-1; ECF 35-2. The first exhibit includes a sworn affidavit from plaintiff.  ECF 35-1.  The SAC does not rely on this affidavit and it is not integral to plaintiff's suit.  Therefore, I may not consider it.  The second exhibit contains a copy of a newspaper article that reflects statements made by Sheriff Jenkins to the media with respect to the denial of a restricted duty assignment to plaintiff.  ECF 35-2. Although a court may take judicial notice of matters of public record, it may not do so with respect to a matter that is "subject to reasonable dispute."  Fed. R. Evid. 201(b); *see Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).  The availability of work that satisfied restricted duty

is a disputed issue associated with plaintiff's retaliation claim, as stated in Count V of the SAC. Therefore, I decline to consider ECF 35-2 in resolving the Motion.

### III.   Discussion

### A.  Count I: Title VII

Count I lodges a Title VII claim for disparate treatment on the basis of sex.  ECF 28, ¶¶ 44-53.  It is predicated on a range of alleged discriminatory actions taken by the individual defendants.

In particular, Sgt. Ensor alleges that Sheriff Jenkins, Capt. Hibbard, and Lt. Warner "brought an IA investigation against Sgt. Ensor yet refused to so when a male officer . . . engaged in very similar conduct." *Id.* ¶ 47.  Moreover, she claims that she was "transferred . . . out of Patrol Operations to Judicial Services at the Courthouse," and was subjected to "exceedingly severe discipline . . . ." *Id.* ¶ 48.  According to plaintiff, Sheriff Jenkins, Capt. Hibbard, and Lt. Warner discriminated against her "in her position at Judicial Services on the terms and conditions of her employment on the basis of her sex." *Id.* ¶ 49.  For example, she contends that Lt. Null discriminated against her while she was working at Judicial Services by "depriving her of lunch, commuting pay, and other privileges accorded [sic] male employees . . . ." *Id.* ¶ 52.  Further, Sgt. Ensor avers that Sheriff Jenkins, Capt. Hibbard, and Lt. Null "discriminated against [her] on the basis of her sex by denying her request in March 2020 for a restricted duty assignment upon her return from hernia surgery but granting male colleagues the same request." *Id.* ¶ 50.

The Movants seek to dismiss the portion of Count I that relates to the denial of a restricted duty assignment.  ECF 31-1 at 7-9.  In short, they argue that these allegations exceed the scope for which plaintiff was granted leave to amend her complaint.  *Id.* at 8.  Further, they claim that plaintiff failed to exhaust her administrative remedies with respect to this allegation.  *Id.* at 8-9.

- 25 -

### 1.  Discrimination Generally

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015). The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). And, "terms, conditions or privileges of employment" is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) (quotation marks and citation omitted).

To state a prima facie claim of discrimination under Title VII, the plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc*., *Inc*., 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)); *see Sempowich v. Tactile Systems Technology, Inc.*, 953 F.4th 643, 649-50 (4th Cir. 2021); *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989) (private sector employees), superseded on other grounds by 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016).  However, exhaustion under Title VII is not jurisdictional. It is,

instead, a "claim-processing rule [ ] that must be timely raised to come into play." *Fort Bend Cty. v. Davis*, ___ U.S. ____, 139 S. Ct. 1843, 1846, 1850, 204 L.Ed.2d 116 (2019).   Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).   *See Kenion v. Skanska USA Bldg., Inc*., RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).   Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted).   If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit. *See, e.g., Miles v. Dell*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant v. Bell Atl. Md., Inc*., 288 F.3d 124, 132 (4th Cir. 2002).

Moreover, the administrative exhaustion process has substantive effect.   Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cty*., 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 963 (4th Cir. 1996).   Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc*., 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508).   To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as

discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to "construe them liberally." *Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Stewart*, 912 F.3d at 705; *Miles*, 429 F.3d at 491 (noting that EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination'") (quoting *Bryant*, 288 F.3d at 132).

## 2.   Analysis

The Movants contend that plaintiff failed to exhaust her administrative remedies with respect to her allegation that defendants violated Title VII by denying her a restricted duty assignment after her hernia surgery in March 2020. ECF 31-1 at 7-9. They claim that this aspect of Count I falls outside the ambit of plaintiff's Charge, and thus is subject to dismissal on the ground that plaintiff failed to exhaust her administrative remedies. *Id.* at 8-9. In addition, they

urge the Court to dismiss plaintiff's "new" sex discrimination claim, concerning the request for a restricted duty assignment in March 2020, on the ground that this allegation falls beyond the scope of permissible amendments for which the Court granted plaintiff leave to amend Count I. *Id.* at 8.

As discussed, the Court previously dismissed Count I to the extent it "concern[ed] the treatment of plaintiff by Null in Judicial Services," without prejudice and with leave to amend. ECF 22 at 58.  A plain reading of the Court's directive indicates that plaintiff was permitted to amend her allegations to include new assertions pertaining to Lt. Null's alleged discrimination against plaintiff while she was working at Judicial Services.  There is no indication in the Court's instruction that plaintiff could only plead facts with respect to discriminatory conduct of a particular kind or that occurred within a given period.  As I see it, the allegations fall squarely within the scope of amendments contemplated by the Court's Memorandum Opinion (ECF 22) and Order (ECF 23) of March 25, 2021.

This determination does not conclude the matter, however.  I turn to the issue of exhaustion of remedies.

The Charge, filed on March 19, 2019, plainly alleges discrimination on the basis of sex. ECF 13-7 at 2.  The narrative portion of the Charge claims, in relevant part, that plaintiff was "disciplined and suspended for violating department policies," and that Lt. Eyler, a male colleague, "who committed a similar violation," was "not disciplined or suspended." *Id.*  Notably, the only date specified in the Charge is November 15, 2018, the date on which plaintiff was "disciplined and suspended . . . ."  ECF 13-7 at 2.

The Court previously determined that plaintiff may bring a claim for "sex discrimination . . . with respect to [plaintiff's] transfer" to Judicial Services, on the ground that the claim was "related to the claim of sex discrimination in the Charge."  ECF 22 at 58.  But, the matter

of restricted duty occurred in March 2020, well after the Charge was submitted.  Yet, plaintiff never amended her Charge.  Nor did she allege a "Continuing Action" when she submitted the Charge.  ECF 13-7 at 2.

The denial of plaintiff's restrictive duty assignment came nearly a year and a half after the discriminatory actions described in the Charge (*see id.*); one year after plaintiff filed her Charge with the EEOC (*see id.*); and one month after the EEOC issued a right-to-sue letter to plaintiff. *See* ECF 28, ¶ 12.  As the Movants maintain, "the passage of more than a year between [plaintiff's reassignment] and the March 2020 surgery stretches the meaning of 'reasonably related' to the breaking point.  ECF 31-1 at 8 (quoting *Sydnor*, 681 F.3d at 594).

In response, Sgt. Ensor urges that the matter of restricted duty is part of "a series of actions" that were discriminatory, and "did not occur in a vacuum."  ECF 35 at 3.  But, she cites no cases to support her position.

Plaintiff appears to invoke the continuing violation doctrine, although she does not do so expressly.  Under this doctrine, a Title VII plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as another act fell within the limitations period and the acts are part of an ongoing pattern of discrimination.  *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222 (4th Cir. 2016); *Agolli v. Office Depot, Inc.*, 548 F. Appx. 871, 874-75 (4th Cir. 2013).   And, "[u]ntil the Supreme Court's decision in [*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)] . . . ,"[s]ome courts allowed post-charge discrimination claims when they were part of a 'continuing violation.'"  *Brooks v. United Parcel Service, Inc.*, DKC-20-2617, 2021 WL 43391914, at *6 (D. Md. Sept. 23, 2021) (citing *Anderson v. Reno*, 190 F.3d 930, 936 (9th Cir. 1999)).

The Supreme Court clarified the applicability of the continuing violation doctrine in *Morgan*, 536 U.S. 101. In that case, the plaintiff, an African American former employee of Amtrak, filed suit under Title VII, alleging racial discrimination and retaliation. He claimed that he had been subjected to various discrete discriminatory and retaliatory acts, and had also experienced a racially hostile work environment. *Id.* at 104. The plaintiff filed a charge with the EEOC, alleging that he was "'consistently harassed and disciplined more harshly than other employees on account of his race.'" *Id.* at 105. However, many of the alleged discriminatory events about which the plaintiff complained took place outside of Title VII's 300-day time period for filing a charge with the EEOC. *Id.* at 106.

Amtrak filed a motion for summary judgment as to all of the events that took place beyond the filing period, which the district court granted. *Id.* The Ninth Circuit reversed, applying the continuing violation doctrine. *Id.* at 106-07. That court determined that a plaintiff may sue on claims that were filed with the EEOC outside of the period established by Title VII if the claims were part of a series of related acts; some of the acts took place within the limitations period; and the plaintiff shows that there is a systematic policy or practice of discrimination, part of which operated within the limitations period. *Id.* at 107. In the view of the Ninth Circuit, each of plaintiff's three Title VII claims (*i.e.*, discrimination, hostile work environment, and retaliation) was sufficiently related to the post-limitations conduct to establish a continuing violation. *Id.* at 107-08. The Supreme Court reversed in part and affirmed in part.

With respect to plaintiff's claims for discrete discriminatory and retaliatory acts, the Supreme Court stated that a party "must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Id.* at 110. The Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

timely filed charges." *Id.* at 113. And, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* The Court went on to define actions that qualify as discrete, stating, *id.* at 114:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.[ ]

However, the *Morgan* Court affirmed the Ninth Circuit as to plaintiff's claim for hostile work environment. *Id.* at 115. The Court observed that, unlike discrete acts, hostile work environment claims occur "over a series of days or perhaps years . . . ." *Id.* And, the Court observed that, with respect to hostile work environment claims, "a single act of harassment may not be actionable on its own." *Id.* Thus, as to hostile work environment claims, the Court concluded, *id.* at 117: "It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." The Court continued, *id.*: "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[ ]" The Court reasoned, *id.*: "It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold . . . that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations . . . ." Thus, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118.

At bottom, *Morgan* made clear that a Title VII plaintiff raising claims of "discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . ." *Id.* at 122. But, *Morgan* did not directly address whether a plaintiff must file a supplemental charge

with the EEOC to bring a claim in federal court for discriminatory treatment that occurred after a plaintiff filed his or her initial EEOC charge. And, to my knowledge, the Fourth Circuit has not conclusively ruled on this issue.[10]

Nonetheless, as Judge Chasanow recently observed: "Post-*Morgan*, the trend in federal courts of appeals has been to hold that discrimination claims," such as plaintiff has asserted here, "must be exhausted by a subsequent EEOC charge or to refrain from deciding." *Brooks*, 2021 WL 4339194, at *6; *see Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673-74 (8th Cir. 2006) (requiring exhaustion of post-charge claims for discrete acts of disparate treatment); *Conner v. Ill. Dep't of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005) (dismissing claim for disparate treatment predicated on post-charge conduct for failure to exhaust because "[t]here was no way for the EEOC to undertake preliminary investigation" with respect to this claim "as contemplated by Title VII's statutory design"); *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (explaining that the principle announced in *Morgan* is "equally applicable . . . to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint") (emphasis in original); *Phillips v. Caris Life Sciences, Inc.*, 715 F. App'x 365, 369 (5th Cir. 2017) (finding that plaintiff's allegedly discriminatory termination constituted "a discrete event for which a claimant must file a supplemental charge or amend the original EEOC charge"); *see also EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 n.5 (11th Cir. 2002) (observing that "Title VII requires a charge to be filed after the alleged unlawful employment practice occurred" and that "occurred

---

[10] In contrast, the Fourth Circuit "took a definitive position . . . regarding post-charge retaliation claims" and determined that a plaintiff "'may raise for the first time in federal court the claim that her employer retaliated against her'" following the submission of a charge for discriminatory conduct. *Brooks*, 2021 WL 43391914, at *7 (quoting *Hentosh v. Old Dominion*, 767 F.3d 413, 416 (4th Cir. 2014)). But, Count I is not styled as a claim for retaliation. Therefore, this line of authority does not apply.

means that the practice took place or happened in the past") (internal quotation marks and citations omitted).

To be sure, in light of the fact that the Charge was not filed by a lawyer, I must construe it liberally. *See Chacko*, 429 F.3d at 509. And, "the 'scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case' before the [EEOC]." *Stewart*, 912 F.3d at 705 (quoting *Hill v. W. Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982)). But, plaintiff's allegations concern actions that took place approximately sixteen months after Lt. Warner served plaintiff with notice of an internal investigation of her conduct (ECF 28, ⁋ 18); fifteen months after she was transferred to Judicial Services (*id.* ⁋ 27); and one year after plaintiff filed the Charge with the EEOC (*id.* ⁋ 13), which expressly focused on the discriminatory manner in which the FCSO investigated plaintiff's conduct and meted out discipline against her. *See* ECF 13-7.

"Courts in this district assume that discrimination claims must be exhausted by a later charge." *Brooks*, 2021 WL 4339194, at *6 (citing *Sharpe v. Prince George's Cnty.*, TDC-17-3799, 2021 WL 928177, at *10 (D. Md. Mar. 11, 2021) and *Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *6 (D. Md. Jan. 3, 2018)). And, in light of *Morgan* and its progeny, as well as the discrete nature of the discriminatory conduct at issue, it is evident that plaintiff's claim in Count I for sex discrimination based on the denial of a restricted duty assignment in March 2020 must be dismissed for failure to exhaust. The dismissal shall be without prejudice.[11]

---

[11] In the Opposition, plaintiff indicates that, since retaining counsel, she has "file[d] an administrative charge with the EEOC against Defendants specifically alleging sex discrimination and retaliation in connection with the denial of Sgt. Ensor's March 2020 restricted duty request." ECF 35 at 4. She states: "This charge is still pending with the EEOC but soon will be ready to request a right to sue letter." *Id.* "Assuming receipt of the right to sue letter, Sgt. Ensor intends to file a new claim with this Court or seek to add it to this action." *Id.*

## B.  Count V: FMLA Retaliation

Count V is styled as a claim for "Discrimination/Retaliation" under the FMLA.  ECF 28, ¶¶ 86-97.  It concerns the Movants' denial of plaintiff's request for a restricted duty assignment following her hernia surgery in March 2020.  *See id.*  The Motion challenges Count V on the ground that it fails to state a claim as a matter of law.  ECF 31-1 at 9-13.

According to Sgt. Ensor, prior to her surgery, she had "requested and had been approved for FMLA leave for the surgery and her recovery."  ECF 28, ¶ 93.  Moreover, plaintiff's doctor "approved her to work on restricted duty during her recovery . . . ."  *Id.*; *see* ECF 26-3.  But, Lt. Null denied plaintiff's request for a restricted duty assignment.  ECF 28, ¶ 93.  As a result, plaintiff "was forced to use her sick leave to cover time off when she was capable of working a restricted duty assignment."  *Id.*[12]  Further, she claims that she was denied the opportunity to "earn overtime pay and possibly any pay . . . ."  *Id.* ¶ 95.

Plaintiff claims that because she gave "Defendants notice of her need for FMLA leave and was granted such leave, [her] actions constitute protected action under the FMLA."  *Id.* ¶ 94.  Thus, according to Sgt. Ensor, the Movants' actions amount to retaliation.  *Id.* ¶¶ 95-96.

### 1.  FMLA Generally

"The FMLA is intended 'to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 381 (4th Cir. 2001) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999)).  Under the FMLA, an "eligible employee shall be entitled to a total of 12

---

[12] This assertion seems to conflict with plaintiff's earlier claim that she "did not have sick time available" at the time of her surgery and thus "was forced to ask her friends and coworkers to donate leave to her . . . ."  ECF 24, ¶ 42.  But, to the extent that there exists an inconsistency between plaintiff's allegations, the difference is immaterial for purposes of resolving the Motion.

workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee is eligible if the employee "has been employed . . . (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). It is undisputed that plaintiff was an "eligible employee."

A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11). "Continuing treatment" includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). "A chronic serious health condition is one which: (1) Requires periodic visits . . . for treatment . . . ; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." *Id.* In some cases, absences "attributable to incapacity" due to a chronic serious health condition "qualify for FMLA leave even though . . . the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack[.]" *Id.* § 825.115(f).

Under the FMLA, there are two types of claims: "(1) 'interference,' in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) 'retaliation,' in which the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Edusei v. Adventist Healthcare, Inc.*, DKC-13-0157, 2014 WL

3345051, at *5 (D. Md. July 7, 2014) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009)); *see also Fry v. Rand Construction Corporation*, 964 F.3d 239, 244 (4th Cir. 2020).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson*, 558 F.3d at 294-95; *see also Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013). Thus, courts have interpreted the FMLA to provide a cause of action for retaliation. *Dotson*, 558 F.3d at 295.

An interference claim "'merely requires proof that the employer denied the employee his entitlements under the FMLA[.]'" *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). In contrast, retaliation requires "'proof of retaliatory intent.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *Stallings*, 447 F.3d at 1051); *see also Edusei*, 2014 WL 3345051, at *6. In addition to refusing FMLA leave, interference includes "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

## 2.  FMLA: Retaliation

The *McDonnell Douglas* burden-shifting framework applies to plaintiff's FMLA retaliation claim in Count V; FMLA retaliation claims are analogous to Title VII retaliation claims. *See, e.g. Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001).

The elements of the claim are as follows: (1) "'[the plaintiff] engaged in protected activity'"; (2) "'[her employer] took adverse action against [her]'"; and (3) "'the adverse action was causally connected to the plaintiff's protected activity.'" *Boone v. Bd. of Governors of Univ. of North Carolina*, 858 F. App'x 622, 624 (4th Cir. 2021) (quoting *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016)); *see Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018); *see also Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019); *Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 429 (4th Cir. 2015); *Irani v. Palmetto Health*, 767 F. App'x 399, 421 (4th Cir. 2019); *Wright v. Southwest Airlines*, 319 F. App'x 232, 233 (4th Cir. 2009); *Yashenko*, 446 F.3d at 551.

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse employment action" is not the standard in a retaliation case. Therefore, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In other words, in a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

An action is adverse in the retaliation context if it might "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (quotation marks and citations omitted); *see Hoyle v. Freightliner, LLC* , 650 F.3d 321, 337 (4th Cir. 2011). By analogy, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray v. International Paper Co.*, 909 F.3d 661, 557 (4th Cir. 2018).

Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

To allege causation adequately, the employee must plead facts that, if proven, would establish that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 F. App'x at 421; *Foster v. Univ. of Md. – E. Shore*, 87 F.3d 243, 252 (4th Cir. 2015). In the Title VII context, "a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

At trial, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [action] was pretextual." *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (brackets added); *see Foster*, 787 F.3d at 249. Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021). Indeed, "[v]ery little evidence of a causal connection is required to establish a *prima facie* case of retaliation." *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (quotation marks and citation omitted); *see CSRA, Inc.*, 12 F.4th at 417. As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require

establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. U.S. Postal Servs., Inc.*, 839 F. App'x 781, 783-84 (4th Cir. 2021)); *see CSRA, Inc.*, 12 F.4th at 417. "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783-84; *see Lettieri v. Equant*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that relevant evidence may be used to establish causation)). Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). "The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

Notably, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654. In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." (Citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted).  And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).  Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to show causation. *CSRA*, *Inc.*, 12 F. 4th at 417.  Rather, temporal proximity is one of two paths.  The other path contemplates "the existence of facts indicative of an adverse action 'because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

At trial, "[i]f a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko*, 446 F.3d at 551); *see also Fry*, 964 F.3d at 245. Plaintiff must first allege that she engaged in protected activity.  In *Fry*, 964 F.3d at 245, the Fourth

Circuit explained: "We have read [29 U.S.C. § 2615(a)(2)] broadly to protect not just employees who 'oppose' unlawful practices . . . but also to protect 'employees from discrimination or retaliation for exercising their substantive rights under the FMLA.'" (Quoting *Yashenko*, 446 F.3d at 546) (emphasis in *Fry*; brackets and ellipses added).

### 3.   Analysis

As indicated, Sgt. Ensor claims that she requested and was approved for FMLA leave for her hernia surgery and a period thereafter for her recovery.  ECF 28, ⁋ 93.  And, she states that her doctor approved her to work a restricted duty assignment during her recovery.  *Id.*  But, plaintiff claims that the Movants retaliated against her for requesting FMLA leave by denying her a restricted duty assignment.  *Id.* ⁋ 95.  Thus, Sgt. Ensor contends that she was deprived of the "ability to earn her usual overtime pay" and she was forced "to ask colleagues to donate sick leave . . . ."  *Id.*  In essence, Sgt. Ensor alleges that the Movants retaliated against her for requesting FMLA leave by requiring her to take the very leave that she sought to obtain.

The Movants maintain that Count V is subject to dismissal for two reasons.  First, they contend that plaintiff was not eligible for a restricted duty assignment.  ECF 31-1 at 9-10.  Second, the Motion posits that Count V fails as a matter of law because the denial of a restricted duty assignment is not an adverse action.  *Id.* at 10-13.

Plaintiff disputes both contentions.  ECF 35 at 4-10.  Even assuming that plaintiff was eligible for a restricted duty assignment, however, it is plain that her claim fails as a matter of law because the denial of her restricted duty assignment does not constitute an adverse action within the meaning of the FMLA.

To the extent that plaintiff alleges that the denial of restricted duty assignment constitutes an adverse action, the FMLA does not require an employer to provide a light duty assignment to

an employee as a substitute for FMLA leave.  *See* 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition . . ., the employee has no right to restoration to another position under the FMLA."); *see also Hendricks v. Compass Grp., USA, Inc.*, 496 F.3d 803, 805 (7th Cir. 2007) ("There is no such thing as FMLA light duty whether pursuant to the statutes or their corresponding regulations.") (internal quotation marks omitted).  And, "[b]ecause the FMLA does not require an employer to accommodate an employee's medical restrictions upon a return to work, an employer's denial of such accommodation should not affect the employer's decision to take FMLA leave." *Hibben v. Potteiger*, 16-CV-111-JFJ, 2019 WL 189837, at *8 (N.D. Okla. Jan. 14, 2019); *see Dennis v. Nationwide Children's Hospital*, 2:15-cv-688, 2016 WL 5468338, at *7 (S.D. Ohio Sept. 29, 2016) (finding that plaintiff could not state a retaliation claim under the FMLA on the ground that his employer refused to provide him with a light duty work assignment, thereby forcing plaintiff to take FMLA leave).

In the Motion, defendants have directed the Court's attention to a policy for FCSO employees, which provides the circumstances in which an employee may be *considered* for a restricted duty assignment.  *See* ECF 31-1 at 10 n.9 (citing General Order 22.2.15).  This policy expressly states that such assignments are not guaranteed and that the Sheriff "is not obligated to provide restricted duty work assignments except as provided in current Federal and State Laws." *See* General Order 22.2.15(B).

In any event, to the extent that plaintiff's suit is premised on the allegation that she was forced to use donated leave from her colleagues, it fails for the simple reason that the FMLA does not guarantee paid leave.  Indeed, the FMLA's governing regulations expressly state: "Generally, FMLA leave is unpaid leave."  29 C.F.R. § 825.207; *see Ragsdale v. Wolverine World Wide, Inc.*,

535 U.S. 81, 86 (2002) ("The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period following certain events . . . .") (citing 29 U.S.C. § 2612(a)(1)).  And, an "employer may require the employee to substitute accrued paid leave for unpaid FMLA leave," meaning that the paid leave "will run concurrently with the unpaid FMLA leave."  *Id.*; *see Freelain v. Village of Oak Park*, 888 F.3d 895, 902 (7th Cir. 2018) (explaining that plaintiff could not maintain a claim for retaliation under the FMLA where plaintiff's employer deducted leave time from employee's "bank of sick days" because such action did not amount to an adverse action); *Keyhani v. Trustees of Univ. of Pa.*, No. CV 17-3092, 2019 WL 2568279, at *6 (E.D. Pa. June 21, 2019) ("requiring Plaintiff to exhaust her paid time off and sick leave before allowing her to use unpaid FMLA leave is contemplated under the regulations and is considered a reasonable accommodation under the law"), *aff'd*, 812 F. App'x 88 (3d Cir. 2020).

Alternatively, plaintiff's claim could be read as asserting that the denial of restricted leave had the effect of forcing her to take leave that she would not have otherwise taken.  *See Tate v. Philly Shipyard, Inc.*, No. 19-5076, 2020 WL 2306326, at *3 (E.D. Pa. Apr. 16, 2020) (reading plaintiff's allegation that an employer's refusal to provide modified duty work as a claim that the employer forced the plaintiff to take FMLA leave).  Some courts have indicated that an employee may state a claim under the FMLA where her employer "violated her FMLA rights by forcing her to take [FMLA leave] when she did not need to do so."  *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 449 (6th Cir. 2007) (internal quotation marks omitted); *see, e.g.*, *Callan v. AutoZoners*, 1:21-cv-01479, 2022 WL 204927, at *5 (N.D. Ohio Jan. 24, 2022); *Popeck v. Rawlings Company LLC*, 3:16-CV-00138-GNS-DW, 2018 WL 2074198, at *12 (W.D. Ky. May 3, 2018); *Huffman v. Speedway LLC*, 13-cv-12453, 2014 WL 5817321, at *4 (E.D. Mich. Nov. 10, 2014), *aff'd*, 621 F. App'x 792 (6th Cir. 2015).

But, as an initial matter, such a claim sounds in interference, rather than retaliation.  *See Wysong*, 503 F.3d at 449 (stating that "[a]n involuntary-leave claim is really a type of interference claim").  Moreover, to my knowledge, the Sixth Circuit appears to be the only federal appellate court that has expressly recognized that "an employer who forces an employee to take leave may create a claim under the FMLA."  *Id.*; *but see Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006) (finding that "forced leave, by itself, does not violate any rights provided by the FMLA"); *Foster v. New Jersey Dep't of Transp.,* 255 F. App'x. 670, 671 n.1 (3d Cir. 2007) (same); *Willis v. Coca Cola Enters., Inc.,* 445 F.3d 413, 417 (5th Cir. 2006) (noting that "it is not contrary to the FMLA for an employee to be placed on involuntary FMLA leave"); *see also White v. Metro. Wash. Airports Auth.*, 1:16-cv-670 (LMB/IDD), 2017 WL 1823183, at *8 n.10 (E.D. Va. May 5, 2017) (observing that "the Fourth Circuit has not explicitly recognized an 'involuntary leave' theory under the FMLA") (quoting *Leonard v. Electro-Mechanical Corp.*, 36 F. Supp. 3d 679, 691 (W.D. Va. 2014)).

Yet, even the Sixth Circuit found that a claim for involuntary leave "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past."  *Wysong,* 503 F.3d at 449. Therefore, I am persuaded that plaintiff may not predicate a claim under the FMLA for retaliation based on a theory that the Movants forced her to take leave when she could have worked a restricted duty assignment.

In sum, I am of the view that plaintiff has failed to plead facts that, if proven, would establish that she suffered an adverse action within the meaning of the FMLA.  Indeed, despite plaintiff's protestations to the contrary (*see* ECF 35 at 9-10), a reasonable employee in plaintiff's circumstances would not be dissuaded from exercising her right to take FMLA leave by the denial

of a restricted duty assignment, which ultimately resulted in the use of paid leave.  *See Burlington Northern*, 548 U.S. at 69.  Rather, such an outcome is wholly consistent with the substantive rights guaranteed by the FMLA.  Consequently, I shall also dismiss Count V.

## IV.    Conclusion

Accordingly, the Motion is granted.  I shall dismiss Count I to the extent that it includes a claim for the denial of a restricted duty assignment in relation to plaintiff's March 2020 surgery, without prejudice.

I shall also dismiss Count V, with prejudice.  And, because there are no other viable claims against Capt. Hibbard or Lt. Null, they shall be dismissed from the suit.

An Order follows.


Date: March 8, 2022                                          _____/s/_____
                                                                            Ellen L. Hollander
                                                                            United States District Judge